**BILTON INSULATION, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 8483.

United States Court of Appeals Fourth Circuit.

Argued March 23, 1962.

Decided May 16, 1962.

Henry St. John FitzGerald, Arlington, Va. (C. Wynne Tolbert, and Tolbert, Lewis & FitzGerald, Arlington, Va., on brief), for petitioner.

Vivian Asplund, Attorney, National Labor Relations Board (Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Melvin J. Welles, Attorney, National Labor Relations Board, on brief), for respondent.

Before SOBELOFF, Chief Judge, and SOPER and BRYAN, Circuit Judges.

SOPER, Circuit Judge.

This case is an aftermath of Bilton Insulation, Inc. v. National Labor Relations Board, 4 Cir., 297 F.2d 141, in which we directed the enforcement of an order of the Board issued on January 13, 1961 which required the company to bargain collectively with United Construction Workers Division of District 50, United Mine Workers of America, as the representative of the company's employees and to cease and desist from interfering with them in the exercise of their right of collective bargaining under the statute. The pending case involves the charge that while the earlier proceeding was in progress the company had discriminated in the rehiring of two workers, who had sought other work in a slack period, by refusing re-employment to one worker and delaying it as to the other because they had engaged in union activities, and had testified for the union in the case then pending. A hearing was had upon the charges in the case at bar before a trial examiner who made findings upon the evidence and sustained the charges, and the Board affirmed his conclusions and directed the company im-

mediately to offer re-employment to the one worker and to make each of them whole for any loss of pay he may have suffered by the company's actions. The order also directed the company to take other steps incidental to the re-employment and recovery of back pay.

The employees affected by the order were Benjamin Robinson, who was not rehired, and Jodie Raines, whose employment was alleged to have been delayed a few days. The essential facts with respect to the charges may be summarized as follows.

The actions of the company of which the union complained in the earlier case took place in September 1959. The hearing by the trial examiner in that case was held in March and April 1960. At this hearing both Robinson and Raines were called as witnesses for the Board. In general, Robinson testified that he had requested the union to organize the workers in the plant, that he had signed a union card, that he had solicited and procured bargaining designations of the union from a majority of the employees, that he had distributed union buttons among them, that the company's manager had insisted that the employees remove the buttons if they wanted to go to work, and that at the request of the superintendent of the plant he signed a petition withdrawing the employees' designation of the union as their bargaining agent. Raines testified at the earlier hearing that he had signed a union card and worn a union button and that he and other employees had been told by the manager to remove the buttons if they wanted to work, and that the superintendent had secured his signature to the withdrawal petition.

In the early part of June 1960 the superintendent of the plant called the employees together and told them that the business was in a slack period and suggested that those who were able to do so should seek work elsewhere. In response, Robinson and Jodie Raines, together with Joe Lewis Raines and one Willie Stevenson joined together to set up an informal organization which they called the R. and R. Company, and engaged in the roofing business. They applied and paid for a Virginia business license, acquired and paid for the use of a truck from Robinson's father, and made several inquiries about renting a place for doing business as contractors. They made several purchases to this end including the purchase of certain insulating material at discount price from their former employer, which led to the inference that they were interested in the business of insulation. They were able to secure three or four roofing jobs that occupied them for three or four weeks and Robinson, during this period, installed the insulating material in his father's house. The Bilton management had knowledge of the fact that the men were engaged in business for themselves. The men found, however, that they did not have sufficient means or sufficient business to set up and carry on an independent concern and, consequently, the Raines' and Robinson applied at different times for reinstatement in their old positions with the company. The treatment of these applications by the company forms the basis of the charges against the company in this case.

## JODIE RAINES

On or about July 1, 1960 when the work of the R. and R. Company slowed down Jodie Raines went to the Bilton plant on a Friday to pay some money which he owed to the company and asked the superintendent if he could come back to work the next day. He was told he would have to see Mr. Bilton, the president. He made no attempt to see Mr. Bilton but returned to the plant on July 6 to seek work and again received the same reply. He did not go to see Mr. Bilton but on July 13 again returned to the plant and applied to the manager for work. The manager said that he had to talk with the president and the superintendent. The next day Raines finally went to see Mr. Bilton who said he could not run his business if workmen wanted to come to work any time they saw fit and he told Raines that he must talk to the company's lawyer before he could come back to

work. During his talk with Bilton, Raines was asked if he had heard Robinson testify at the former hearing before the trial examiner and he replied that he had not heard the testimony. The lawyer came to the plant for the interview and Raines told him what work he had been doing and that he wanted to come back to the plant because he needed the job and lived nearby and had no transportation. The two men then went to the lawyer's office and the lawyer wrote down all Raines had said and Raines signed it. He was taken back to work the following day. No promise or offer was made to him in regard to his statement or his re-employment. A copy of the statement was given to the General Counsel but it was not admitted in evidence.

## JOE LEWIS RAINES

Joe Lewis Raines was called as a witness on behalf of the General Counsel. He testified as to the work of the R. and R. Company for a period of about two months, and that he went back to the plant for work about two weeks after his brother Jodie had returned. He applied to the manager on a Saturday and was told that he would have to see the superintendent on the following Monday morning at eight o'clock. He went to the plant at that time and was told by the superintendent to see Mr. Bilton. Later in the day Bilton came in and had a conference with the manager who then told Raines that he would let him know about the work on the following Wednesday or Thursday. On Wednesday he applied again and the manager was unable to give him an answer. A week after that on Friday the manager got in touch with him through his brother and he went back to work on the following Monday. He had some conversation with the manager in regard to the union. He did not remember who brought the subject up. It related to the wearing of union buttons and signing a union paper but he told the manager that he did not know anything about the buttons and did not sign the paper. There was no evidence that he ever joined the union.

## TRIAL EXAMINER'S CONCLUSIONS AS TO THE RAINES BROTHERS

The examiner's report was filed April 18, 1961. His conclusions with respect to the Raines brothers were as follows:

" * * * Obviously the Respondent's concern in the cases of both the Raines brothers, was that they might continue the Union's activities among the employees if they were rehired, and its unusual treatment of their applications was designed to discourage such a course. Although there was no appreciable delay in hiring Joe Lewis Raines, Jodie Raines' reemployment was delayed from July 6, the date of his application, until July 15, 1960. I conclude that the Respondent's treatment of the applications of the Raines brothers was prompted in Jodie's case by his union activities and previous testimony before the Board, and in Joe Lewis Raines' case by the Respondent's suspicion that he, too, might be and continue to be a supporter of the Union, and that it was therefore such interference, restraint, and coercion in their exercise of the organizational rights guaranteed by Section 7 of the Act as to be an unfair labor practice within the meaning of Section 8(a) (1). I further conclude that the Respondent's delay in rehiring Jodie Raines was such discrimination against him in regard to his hire and tenure of employment as to constitute a violation of Section 8(a) (3) of the Act and that, since it was based in part upon the testimony he had given against the Respondent under the Act it was also a violation of Section 8(a) (4) of the Act."

These conclusions, which were affirmed by the Board, cannot be sustained for the reason that they are based, in part, on an incorrect statement of the facts and do not fully consider the whole evidence bearing upon the inquiry whether the employer was guilty of an unfair labor practice in delaying the re-employment of the men. The examiner said

that there was no appreciable delay in hiring Joe Lewis Raines but that the re-employment of Jodie Raines was delayed from July 6 until July 15. The evidence of Joe Lewis Raines himself shows that he applied for work on a certain Saturday about two weeks after July 4th and was not taken back until two weeks after the following Monday, although he had several conversations with the management in the interval. In other words, the delay in his case was as long or longer than that of Jodie Raines; and, as in the case of Jodie, he was required to see Mr. Bilton before he was put back to work.

Moreover, the examiner gave no weight to the fact that the management treated both men substantially alike in respect to re-employment although Jodie Raines was a member of the union and, so far as the record discloses, Joe Lewis Raines was not a member of the union and did not take part in union activities. The examiner reaches the conclusion that the company was induced by "suspicion that he, (Joe Lewis Raines) too, might be and continue to be a supporter of the union" without reference to any evidence on the point and without mention of the testimony on the part of management that the re-employment of these men was not affected by their attitude toward the union.

It should be borne in mind that the actions of the company which the examiner condemns took place during the pendency of the earlier unfair labor practice proceeding and that during this interval the employer would naturally proceed with great caution in every step that he took and was, therefore, justified in calling in his lawyer for advice when the men made an application for re-employment. An additional circumstance which justified a careful consideration of the applications for re-employment by the management was the fact that the men had been engaged for some weeks past in running an independent business of a nature similar to that of the company, with some reason to believe that they were engaged in the same line of insulating houses as the company itself. The examiner found that the company violated the statute in delaying the re-employment of Joe Lewis Raines although neither Raines himself nor the General Counsel filed a complaint against the company in this respect. With regard to Jodie Raines, the examiner's most noticeable lapse was his omission to notice that Jodie Raines did not go to see the president of the company as he had been told to do by the superintendent, if he desired work, until two weeks after his first application. Had he obeyed the direction in the first instance, there is reason to believe that he would have been as promptly reinstated as he was when he finally followed instructions.

## BENJAMIN F. ROBINSON

Handicapped by the fixed idea of the company's conduct manifest in these conclusions as to the Raines brothers, it is not surprising that the examiner did not fairly consider the testimony with respect to re-employment of Robinson. He had been a leader in the successful movement to unionize the plant which culminated in September 1959, and led to the charges of unfair labor practice against the company which were pending before the examiner during the time that the Raines brothers and Robinson applied for re-employment. Robinson was a man of considerable ability in his line. But the evidence on the part of the company showed that he was dilatory and irregular in his work habits. He was adept in avoiding work of an unpleasant nature. On occasion he became insolent and offensive in his demeanor. In March 1960 a customer of the business named Brandt wrote to the company in regard to Robinson's performance on an insulating job that "this man was the most rude and insulting of any man that I have ever encountered in the construction business". Thereafter, the customer ceased to do business with the company. This circumstance, as we shall see, is of importance in evaluating the motive for the refusal to re-employ Robinson.

Robinson left the Bilton plant and became a member of the R. and R. Com-

pany, as above described, and worked with it during the month of June 1960. During this period he visited the plant on paydays to see his friends and play craps. He made some inquiries about coming back to work and was told that their work was slack and got the impression that the manager and foreman were uncertain whether he would be allowed to come back when business picked up. About this time Bilton noticed that Robinson's name did not appear on the payrolls, and upon inquiry was told of the R. and R. Company, and instructed the manager to send the members of the firm to him if they came back looking for work.

The matter came to a head as to Robinson on July 6, 1960 when he came to the plant early in the morning and asked for work and was referred to Bilton. Robinson then telephoned to Bilton at his home before seven A.M., and got him out of bed. The version of the two men as to what took place during the telephone conversation differs in detail but not in main outline. Robinson's version was that he asked if he could come back to work and was met with the inquiry: What did he think Bilton "was running there"; that he tried to explain why he had been away from the plant but Bilton was rather reluctant to hear him out, and then he asked if he was fired and Bilton replied that he was fired.

Bilton's version was that Robinson got him out of bed at ten minutes of seven in the morning, told him that he had been refused work at the plant, asked if he was fired and, when Bilton asked where Robinson had been in the past two or three weeks, Robinson said that this was beside the point and demanded to be told if he was fired, whereupon Bilton replied "you may take it any damn way you please."

The examiner accepted Robinson's testimony rather than that of Bilton as he did in every instance in which Robinson's testimony differed from that of management. It is manifest, however, whichever version is accepted, that Bilton was irritated by the peremptory conduct of Robinson who would not wait to see Bilton at the plant but telephoned him before he was out of bed and demanded then and there a decision as to whether he was discharged. Bilton's reply was the immediate and spontaneous decision of the moment, obviously inspired by the attitude of the employee to the head of the business, rather than hostility to the union.

At the trial Bilton testified that he was influenced by a number of other things in making his decision. He referred to the activities of the four men in going into business for themselves as he had done years before when, as a young man, he started from scratch. He referred also to Robinson's irregular work habits and to the Brandt incident, all of which came to his mind when he learned that Robinson was not on the company's payroll in June. The examiner rejected all of these reasons as trumped up to suit the occasion. He analyzed the work records and found that they did not conclusively prove that Robinson was actually absent from work a large number of days as they seemed to show, rejected the oral testimony of the managers that Robinson was dilatory and irregular in his attendance, accepted Robinson's contrary testimony as true, scoffed at the idea that Bilton feared the competition of his men, and minimized the Brandt incident because Bilton had accepted Robinson's apology and transmitted it to Brandt and regarded the matter as closed.

It seems obvious that after the event of July 6 a number of reasons suggested themselves to Bilton to justify his quick action on that morning; but it is equally obvious that the examiner approached his decision with the fixed conviction already revealed in the Raines cases that Bilton's conduct could only have been inspired by hostility to the union. The examiner completely rejected the testimony of the company when it conflicted with that of Robinson; and he ignored the evidence of Robinson himself that when it suited his interests he engaged in practices which frustrated the company's policy of distributing the good and

bad work amongst the employees, by conniving with his friends amongst the workers and sharing with them the more desirable jobs, unknown to his employer.

It is especially significant that the examiner has nothing to say as to the improbability that Bilton, during the period when the previous charges of unlawful conduct were being investigated and tried, would do anything to strengthen the case against him; and it is even more significant that the examiner ignores the fact that Bilton had a perfect opportunity to discharge Robinson for good cause, free from suspicion of improper motive, when he received the Brandt letter and learned of Robinson's insolent conduct towards a customer and the possible loss of the customer's business. Rather than throw the man out Bilton received his apology and let him stay on the payroll. On these points the examiner had nothing to say and our conclusion is that his finding as to Bilton's motive in refusing to employ Robinson was based on an inadequate consideration of the evidence and, therefore, should not be sustained.

We have in mind the admonition of the Supreme Court in N. L. R. B. v. Walton Mfg. Co., 1962, 82 S.Ct. 853, that the testimony of an employer, as to the reason for the discharge or failure to reinstate an employee, is subject to the same scrutiny as other evidence and need not be accepted by the trial examiner if he finds it incredible. The test of the substantiality of evidence in such cases is the same as in other cases; but it is also held that the reviewing function of the decisions of the Labor Board has been deposited with the Court of Appeals and that the Board's finding of fact must be supported by substantial evidence "on the record considered as a whole", and that the reviewing court "is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71

S.Ct. 456, 95 L.Ed. 456; N. L. R. B. v. Pittsburgh S. S. Co., 340 U.S. 498, 71 S.Ct. 453, 95 L.Ed. 479.

Petition for review is granted and enforcement of the Board's order is denied.