RIGGS DISTLER & COMPANY, Inc.,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 8988.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 1, 1963.

Decided Dec. 27, 1963.

Everett L. Buckmaster and C. Gordon Haines, Baltimore, Md. (Wright, Robertson & Dowell, and Buckmaster, White, Mindel & Clarke, Baltimore, Md., on brief), for petitioner.

Robert A. Armstrong, Attorney, National Labor Relations Board (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Solomon I. Hirsh, Attorney, National Labor Relations Board, on brief), for respondent.

Before SOBELOFF, Chief Judge, and BRYAN and J. SPENCER BELL, Circuit Judges.

J. SPENCER BELL, Circuit Judge.

Riggs Distler & Company, Inc., Petitioner in this action, petitions this court to review and set aside a decision of the National Labor Relations Board, holding that Petitioner violated section 8(a) (1) and (3) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1) and (3). The board cross petitions for enforcement of its order that Petitioner cease and desist from engaging in unfair labor practices and provide affirmative relief.

The Board upheld the Trial Examiner's ruling that Petitioner discharged from its Crane Powerhouse job four employees,[1] the charging parties in this action, because of their membership in Local No. 28, Brotherhood of Electrical Workers, formerly International Brotherhood of Electrical Workers, AFL–CIO. The Board concedes that this is not the typical situation in which an employer is charged with discriminating against employees because of antipathy toward a particular union or unions generally. Petitioner has never favored one union over another and its background is completely free of anti-union bias. The Board, nonetheless, finds that Petitioner's general foreman, Carl M. King, in obtaining the discharge of the charging parties, and Superintendent Henry B. Duke, in acquiescing in King's recommendation that they be fired, were unlawfully motivated. The Board holds Petitioner liable under the doctrine of *respondeat superior*.

Deeming it necessary to inquire into the state of King's mind at the time he obtained the discharges, the Board's appeal brief sets out as background the interunion dispute between Local No. 24, International Brotherhood of Electrical Workers, AFL-CIO [hereinafter Local 24] and Local No. 28, Brotherhood of

1. Edwin A. Sweglar, Jr., G. Howard Groscup, James C. Dunn, Sr., and C. Robert Fenner.

Electrical Workers [hereinafter Local 28]. The Board states that King, prior to his defeat as Business Manager in 1960, was for a number of years an elected official in Local 28, the electrical workers' union which maintained contractual relations with the Maryland Chapter of the National Electrical Contractors' Association [hereinafter NECA], bargaining agent of Petitioner and other electrical contractors in the Baltimore area. On June 10, 1961, without securing the consent of the national officers, members of Local 28 went on strike against Petitioner and other Baltimore contractors. The national officers thereupon revoked Local 28's charter and on August 7, chartered Local 24 in its place. Local 24 entered a collective bargaining agreement with the affiliated members of NECA the following month.

The Board remarks on the internal difficulties and dissension among the membership of Local 28 regarding the state of affairs between Local 28 and the national officers, both before and during the strike. A number of Local 28 men left the organization and became charter members of Local 24. Included among that number was King. The Board's appeal brief points out that King, in crossing the picket line of Local 28 and returning to work, "apparently became a victim of some of the violence which marked the inter-union dispute when paint was thrown all over his house and the tires and brake hose of his car were cut." From the above facts, culled from a record which is candidly admitted to be none too clear, the Board infers that King developed a preoccupation with the possible disruptive influence on Petitioner's employees which might result if Local 28 electricians returned to work. By inferring a pre-existing animus on the basis of the above facts and other facts not contained in this record, the Board interprets the subsequent discharges as a violation of sections 8(a) (1) and (3) and rejects Petitioner's contention that they were prompted by misconduct.

The record reveals that on Monday, October 9, 1961, the Company hired nine Local 28 electricians, including the four charging parties. After an interview at NECA's office concerning their qualifications, these nine men were given referrals to Petitioner, who hired them for its Crane Powerhouse job, without making inquiries as to their union affiliations. The four charging parties testified that an important reason for returning to work was to protect their right to vote in the event that the Board conducted a representation election among Petitioner's electrical workers. Indeed one of the charging parties, Dunn, characterized this motive as his most important consideration in returning.

The first pair of the charging parties, Sweglar and Fenner, reported to work the same afternoon they were hired; Dunn and Groscup reported the following morning, Tuesday, October 10. On Tuesday, at Sweglar's request, King paired him to work with Fenner under foreman Hedrick. Sweglar had initially been paired to work with Dull, another Local 28 member. Dunn and Groscup were paired to work under foreman Adams. Significantly, foremen Hedrick and Adams, the immediate supervisors of the charging parties, and the men who actually initiated the discharges, were charter members of Local 24 and had never been members of Local 28.

### Misconduct On The Job

The Company presented evidence, admitted by the four charging parties in important particulars, that throughout their entire period of employment; i. e., Monday or Tuesday, October 9 or 10, until Thursday, October 12, these men engaged in wasteful and contentious activities.

### Sweglar and Fenner

Sweglar and Fenner, although not required to divulge their union affiliation to Petitioner's officials or supervisors, chalked "28" on their metal hats for recognition and acceptance by other crafts working on the Crane Powerhouse job. This stratagem was obviously suc-

cessful since both Sweglar and Fenner admitted engaging in repeated conversations with members of other crafts.[2] Both denied that the length or number of conversations were excessive. On the other hand, neither would have anything to do with members of Local 24, Petitioner's employees with whom they were required to work most closely. On one occasion Sweglar, when asked by a Local 24 electrician how long he would be using a saw, admitted replying in an abusive and obscene manner. The remark was not made in jest.

On Wednesday, while signing in for work, the four charging parties noticed that King's named had been crossed out on the time sheet and the word "rat" inserted alongside it. Sweglar pointed out the insertion to others, stating that he "laughed" and "agreed with it."

Throughout the employment period, Sweglar and Fenner were observed taking coffee breaks which in the opinion of their immediate supervisor, Hedrick, were excessive. Although discounted by the Trial Examiner, Hedrick testified that he admonished them not to abuse the privilege and subsequently warned that they had a "job to do" and were "wasting too much time."

Hedrick, corroborated by another witness, testified that Sweglar and Fenner stopped working before the regular lunch hour and utilized this time and other working portions of the day for personal phone calls. Sweglar conceded that two phone calls were made on the phone in the guard shack to John E. Parks, a member of Local 28, to report incidents occurring on the job.

Following the above alleged acts of misconduct, Hedrick testified that he went to King on Wednesday and complained about the quantity of work being done by Sweglar and Fenner and stated that he did not want them in his crew any longer. Hedrick testified that Sweglar and Fenner were ten minutes

late reporting to work on Thursday morning. Later that same day, Hedrick again discussed the situation with King and recommended that Sweglar and Fenner "should be let go as they were causing contention among the men".

## Dunn and Groscup

Shortly after the four charging parties had their laugh over the rat incident, John Tewey, Petitioner's field accountant, approached all nine Local 28 men, who were then standing in a group, and admonished them for defacing the time sheet. At about the same time, King also approached the Local 28 group and announced that some men had left the locker room early the day before. He stated that no one was permitted to depart until the 4 o'clock whistle blew. King then warned that if anyone failed to heed this warning, he could "keep on walking." Dunn and Groscup admitted to King that it was they who had left a few minutes early on Tuesday, but denied seeing a posted sign in the locker room stating that "Riggs Distler's men are not to leave locker area until whistle blows at the end of work day." The Board found that the departure was an innocent mistake that was never repeated. Since the sign was conspicuous in size and positioned directly in front of the place where the men "signed out" it is, to say the least, difficult to accept the Board's characterization of this conduct as innocent. The testimony of Groscup himself, moreover, indicates that he was aware that quitting time was 4 o'clock and informed Dunn that it was not yet that time when Dunn first suggested that they leave.

On their first day on the job, Dunn and Groscup were assigned to make up a list of materials needed for the performance of their job. When foreman Adams did not immediately return to give them a requisition for the materials, Groscup admitted that he and Dunn waited around from 7:30 until 9:00 A.M.

2. Apparently a favorite topic of conversation was the hostility shared by other crafts and Local 28 electricians toward King and other of Petitioner's supervisors. The opinion was often expressed that King would "get it" some day.

rather than report to Adams for the requisition or for reassignment. Although Groscup gave as his reason for standing idly around that he and Dunn might consume as much as two hours in finding Adams, they departed for coffee around 9:00 o'clock with the view that "they would probably run into the foreman on the way." On a later occasion, Groscup admitted that after he and Dunn obtained four coils of wire from the storeroom they did no work between 3:30 and 4:00 P.M., notwithstanding the fact that this period could have been used to obtain material which would also have to be used in connection with the wire first thing the following morning.

Other evidence presented by Petitioner against Dunn and Groscup was similar to that presented against Sweglar and Fenner. Both King and Adams testified that they observed Dunn and Groscup wasting time by talking to members of other crafts and taking excessive coffee breaks. According to Adams, he observed them on a number of occasions drinking coffee with members of other crafts for periods of twenty or thirty minutes. Predictably, Dunn and Groscup denied all the allegations of King and Adams that their conversations and coffee breaks were excessive.

Adams testified that he had two discussions with King prior to the discharges concerning Dunn's and Groscup's performance on the job. On the first occasion, he complained of their not "producing"; on the second, he told King that he could not work these men efficiently.

Late Wednesday afternoon or Thursday morning, King recommended to Superintendent Duke that Sweglar, Fenner, Dunn, and Groscup be discharged for misconduct. Following his usual practice, Duke accepted the recommendation of King because of the latter's more intimate familiarity with the immediate details of the job. At Duke's direction Field Accountant Tewey prepared Release and Termination of Employment forms for the charging parties, assigning as the reason for discharge "Insubordination, lack of cooperation with other employees, lack of interest in work and wasting too much time."

Later Thursday afternoon, foremen Adams and Hedrick informed the four that Superintendent Duke wanted to see them in his office. Upon their arrival Tewey requested that they sign the previously prepared termination forms. They indignantly refused, denying the truth of the asserted reasons for discharge. They further protested their discharge to Duke when he arrived at the office and requested reinstatement. As Groscup continued to plead for his job, Dunn testified that he told Groscup: "[Y]ou are just wasting your time, that old bastard ain't got long to live anyhow." The Trial Examiner discounted this statement as a threat, while conceding that Duke obviously took it as such, stating that if he later found out that he was wrong about the discharges he would be the first to apologize, but that he resented being threatened. The charging parties were then paid their wages, left, and filed the unfair labor practice charges the following day.

■■ We accept the Board's contention that Petitioner's past policy of strict neutrality in dealing with rival unions is no bar to a charge of violating the National Labor Relations Act if its supervisory personnel in the present controversy discharged employees for unlawful reasons. As this court stated in NLRB v. A. S. Abell Co., 97 F.2d 951, 956 (4 Cir. 1938): "The doctrine of respondeat superior applies and the management must assume responsibility for the actions of its supervisory official even though it had no actual participation therein." Accord, Allegheny Pepsi-Cola Bottling Co. v. NLRB, 312 F.2d 529 (3 Cir. 1962).

■ If the record as a whole supports the Board's finding that King's real motive in prompting Duke to discharge the four charging parties was because of their membership in Local 28 and not because of their misconduct on the job, we have no choice but to affirm. Upon

**580**

a careful review of the whole record, however, we feel that the Board's decision lacks the requisite substantial evidentiary support. See Universal Camera v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Under NLRB v. Walton Mfg. Co., 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962), the sworn and unimpeached testimony of an employer as to the reason for the discharge or failure to reinstate an employee need not be accepted by the trier of fact and may be disregarded in part or in whole if he finds it incredible. In the present controversy, the Board would have us go far beyond the admonition in Walton and affirm where the Trial Examiner has not only totally disregarded the testimony of all company witnesses but has consistently ignored all unfavorable testimony elicited from the discharged employees themselves. See Bilton Insulation, Inc. v. NLRB, 303 F.2d 98, 103 (4 Cir. 1962).

The discharged parties' testimony, according to the Board, was "impressively sincere, and straightforward, freely acknowledging matters which would not possibly serve their best interests". Admissions may be impressively sincere and straightforward and at the same time fatal to the interest of the witness. Such is the case here, for even discounting the reasons for discharge advanced by Petitioner, we think that the testimony and admissions of the discharged parties indicate that their conduct warranted discharges. In view of this highly damaging evidence, we are unable to find substantial support for the Board's broad conclusion that "the charging parties did not engage in the conduct asserted as ground for their discharge." Our review of the record persuades us that the conduct actually transpired and further, that this conduct was the basis of Petitioner's action.

■■■■ It is true that questions of credibility, involving the Trial Examiner's observation and appraisal of the reliability of the witnesses, are matters properly for the Trial Examiner's and Board's determination. NLRB v. School-

Timer Frocks, Inc., 224 F.2d 336 (4 Cir. 1955); NLRB v. Dinion Coil Co., 201 F.2d 484, 487–690 (2 Cir. 1952); Eastern Coal Corp. v. NLRB, 176 F.2d 131 (4 Cir. 1949). Nonetheless the Board, after discounting all explanations offered by an employer for discharge of employees, must find unlawful motivation through substantial direct or indirect evidence. Substantial evidence was defined by this court, speaking through Chief Judge Parker in Appalachian Electric Power Co. v. NLRB, 93 F.2d 985, 989 (4 Cir. 1938), as: "[E]vidence furnishing a substantial basis of fact from which the fact in issue can reasonably be inferred; and the test is not satisfied by evidence which merely creates a suspicion or which amounts to no more than a scintilla or which gives equal support to inconsistent inferences." See also NLRB v. Florida Steel Corp., 308 F.2d 931 (5 Cir. 1962); NLRB v. Huber & Huber Motor Express, Inc., 223 F.2d 748, 749 (5 Cir. 1955); NLRB v. Shen-Valley Meat Packers, Inc., 211 F.2d 289, 293 (4 Cir. 1954).

The record in the instant case fails to furnish the Board with the requisite substantial evidentiary basis. We think that these continued acts of misconduct, if tolerated by management, might well cause unrest among the other electricians. Such unrest would have nothing to do with the union affiliation of the charging parties, but would be prompted by seeing fellow employees being paid for wasting time and apparently being coddled by indulgent supervisory personnel. Cf. NLRB v. Ryder Tank Lines, Inc., 310 F.2d 233 (4 Cir. 1962); NLRB v. Superior Tool & Die Co., 309 F.2d 692 (6 Cir. 1962). Finally, we are unable to accept the Board's contention that Petitioner's *failure* to discharge five other Local 28 men, hired concurrently with the four charging parties, was additional evidence of Petitioner's unlawful motivation. The Board reasons that a wholesale discharge of all nine Local 28 electricians would have "completely exposed King's hand." There is no evidence in the record to indicate that King

had a hand to expose. Indeed the Board finds as a fact that King harbored no personal animosity toward the charging parties. Adams and Hedrick, the foremen who actually initiated the discharges by recommending to King that the four be dismissed, were charter members of Local 24 and had never been members of Local 28. The logical explanation for the discharges in such circumstances is that King suggested that only these particular men be discharged because the other five Local 28 men were satisfactory employees who had given Petitioner no cause to terminate their employment.

For these reasons we find that there is not substantial evidence in this record to support the Board's finding of improper motivation for the discharges. The Order will be set aside and

Enforcement denied.