**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DOVE COAL COMPANY and Lark Coal Company, Respondents.**

**No. 10209.**

United States Court of Appeals Fourth Circuit.

Argued March 11, 1966.

Decided Nov. 29, 1966.

Julius Rosenbaum, Atty., N. L. R. B., (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Warren M. Davison, Atty., N. L. R. B., on the brief), for petitioner, and

Dean E. Denlinger, Dayton, Ohio (Smith & Schnacke, Dayton, Ohio on the brief), for respondent.

Before BOREMAN and ALBERT V. BRYAN, Circuit Judges, and MARVIN JONES, Senior Judge *, United States Court of Claims.

ALBERT V. BRYAN, Circuit Judge:

Under the National Labor Relations Act the Board has found Dove Coal Company and Lark Coal Company in violation of §§ 8(a) (1) and (3), 29 U.S.C. 158 (a) (1) and (3), and now petitions for enforcement of its orders. The 8(a) (1) infractions consist of the unlawful interrogation of employees in regard to their union activities [1] and threats to the employees to close the mines if they brought in a union; the 8(a) (3) breaches are the discharge or layoff of miners to discourage union membership. The Board ordered cessation and desistance in the interrogation and threats, and reinstatement of the terminated and unrecalled employees, with reimbursement for any wages lost.

█ We enforce the orders. With the companies, we think the trial examiner, all of whose now relevant findings the Board adopted, should have detailed the facts upon which he rejected the employers' explanations of their actions. In this regard the report is too general, and sometimes objectionably sweeping. However, we cannot say that the ultimate findings are without a substantial evidential floor.

These companies each have a coal mine at Big Rock, Virginia, approximately 200 yards apart. Dove began operations in early 1963, and Lark commenced installation in October 1963 and started extracting in January 1964. Both were under the management of Jess Nelson, as president of Dove and manager of Lark.

Nelson had previously mined in West Virginia, where all of his employees had been union members.[2] He hired for Dove and Lark several men who had worked for him earlier. At the time of their engagement Nelson advised all employees that the mines must be non-union. This explanation was made, he said, because his companies would not be able to pay the royalties demanded by the union to provide the men with hospitalization and other benefits. He stressed that the entry of a union would mean the mines' closing.

On Monday, February 3, 1964 a union [3] took steps to organize the employees at both mines. Nelson learned of these efforts the next day and at once undertook a thorough inquiry of his employees' intentions and interest in this movement. On Wednesday, February 5, Lark employee Ray Hutchinson was discharged. On Monday, February 10, five Dove employees—Leo Bennett, Ledford Osborne, Ferrell Lester, Charles R. Dixon and Joseph H. Barton—were laid off. Their terminations were imputable, the Board held, to their acceptance of the union.

Hutchinson was first employed by Lark in October 1963 in the installation of the mining facilities. In January 1964, he took a permanent job with Lark. He was a jack-setter on an appliance known as a continuous miner machine. Attended by two jack-setters, the machine was moved along the face of the coal vein by a rope running from the machine to a jack on either side. One jack would pull it in one direction, and the other the opposite way, as the single operator wished. During Hutchinson's shift on February 4, the rope at his machine broke on three separate occasions. The last was just before he was leaving work in the afternoon. On reporting for work the next morning, February 5, he was discharged.

---

* Sitting by designation.

1. Unlawful interrogation is admitted by the companies.

2. United Mine Workers of America, District No. 29, Local 7831.

3. United Mine Workers of America, District No. 28.

The reason given for Hutchinson's discharge was that the ropes were broken through his negligence. The company's evidence shows that he had been previously warned of his inattention to the ropes. His foreman, David Boyd, testified that he had witnessed this neglect on the day of the last incident. On the other hand, Boyd concedes that he did not remonstrate with Hutchinson at the end of his shift, stating that he preferred to "cool off" before firing him. That night Boyd talked with Nelson, who was still investigating the union's imminence. Nelson directed that Hutchinson be released for careless work. Hutchinson testified before the trial examiner that the parting of ropes was not uncommon, that he had known as many as 7 to be broken on a single shift without employee censure.

The testimony is that at lunch on his last day Hutchinson had expressed a wish to join a union. That evening he signed an application for membership. The company contends it had no knowledge of Hutchinson's statement or union application. However, as there were only 18 employees at Lark, and Nelson was then alert to sense union sympathy, word of a worker's attitude could readily spread.

█ In the circumstances, the Board found that Lark had notice of Hutchinson's union inclinations and that his discharge might fairly be attributed to that leaning. We cannot say the Board's conclusion rests on insubstantial proof.

█ The 5 employees of Dove laid off on Monday, February 10, had all joined the union during the week of February 3. One of them, Bennett, had been called long distance at his home by Nelson on Saturday, February 8 and told that he need not return to work. The reason given at this time was his union persuasion. He reported for work on Monday however, and then was told, with the other 4, that their lay-offs were due to a "cut back" in the mining. The Board rejected this explanation, and we cannot say its ruling is unfounded in the evidence.

Specifically, the company maintained that the cut back was necessary to lower the percentage of "dirty coal" in its production. This term refers to the relative quantity of rock, ash or other noncombustible material in the extractions. Henry Bailey, sole purchasing agent for all of the companies' coal, testified that he would caution a supplier delivering coal having an impurity content in excess of 7%, and would refuse to purchase if the problem persisted.

The Dove operation was divided into two main sections. In one, excavation was performed by blasting the coal out and then gathering it with a work loader, called a "pig". This area of work was thus designated the pig section. The other section was worked by a continuous miner machine, using augers to undercut and withdraw the coal. This method was more efficient, and collected less "dirt", than the pig. As the coal captured in the pig section was likely to be unacceptable because of its impurity, it was intermixed with coal from the other section to satisfy the purchaser's standard.

Commencing in October 1963, Dove had considerable trouble with dirty coal. Bailey complained, and a variety of expedients was tried to eliminate the foreign matter. With none of its experiments successful, in the last of December 1963 Dove abandoned an entire section of the mine and moved the equipment elsewhere. Until January 14, the character of the minings was better but thereafter it lapsed again.

Dove then determined to halve the work force on each shift in the pig section. As there would then be less coal from the pig section to mix with the purer coal from the other section, the effect would be to reduce the percentage of dirt in the entire production. The 5 employees of Dove released on February 10 labored in the pig section. Four were chosen for termination, the company said, because of the lower quality of their work, and one, Bennett, because of his declared intention to quit.

█ Evidence adduced by the Board's General Counsel indicated that the "dirty

coal" problem was not the real cause of the lay-offs, and we cannot say the trial examiner was wholly unwarranted in adopting this view. The concurrence of the lay-offs with union activities, Nelson's telephone conversation with Bennett and the fact that the suspended employees were union adherents point to an anti-union motivation. At the least, indubitably it was a factor in Dove's decision, and this is sufficient to declare the suspensions discriminatory. NLRB v. West Side Carpet Cleaning Co., 329 F.2d 758, 761 (6 Cir. 1964); NLRB v. Overnite Transportation Co., 308 F.2d 284, 294–295 (4 Cir. 1962).

■ In rebuttal of Dove's contention that the furloughs were economically justified, the trial examiner warrantably found that purchasing agent Bailey had not warned the companies of a "dirty coal" problem during the period immediately preceding the releases. There is nothing to suggest that the company had greater cause for concern with "dirty coal" on February 8 than at any earlier period. Certainly, the claimed economic justification is not made clear in the evidence. At best, there was a conflict on the issue, a difference to be resolved by the trial examiner. The evidence underlying his resolution of it against the employers is not insubstantial. See NLRB v. Williams, 195 F.2d 669, 672 (4 Cir. 1952), cert. denied 344 U.S. 834, 73 S.Ct. 42, 97 L.Ed. 649.

■ In this connection, the companies assign error to the trial examiner's refusal to receive certain testimony proffered by purchasing agent Bailey. It consisted of an alleged warning by Bailey to Nelson of dirty coal between January 31 and February 10, 1964. The trial examiner did not demand, as the companies complain, that the witness pin-point the day of the conversation. He did insist that Bailey first be able to say that it in fact occurred at some time between those dates. For his failure to do so, the examiner excluded the tender. This was not error.

■ Lastly, we have no difficulty in sustaining the Board in its finding that Nelson impermissibly threatened to shut down the mines upon admission of the union.

We will enforce the orders of the Board.

Orders enforced.

BOREMAN, Circuit Judge (concurring in part and dissenting in part):

I concur with the majority in holding that the companies were guilty of unfair labor practices in interrogating employees in regard to their union activities and threatening closure of the mines if the employees brought in a union. In other respects I respectfully note my disagreement.

The majority opinion states that the trial examiner should have detailed the facts upon which he rejected the employers' explanations of their action and in this regard "the report is too general, and sometimes objectionably sweeping." In my view these are gross understatements with respect to the examiner's performance and his failure to find facts to support his conclusory determinations. Despite the examiner's failure to weigh the evidence, resolve conflicts therein and find facts the Board's brief in this court seeks to cure these deficiencies by attempting to analyze the testimony and make the credibility resolutions judicially recognized as necessary to an acceptable administrative determination. The integrity of the administrative process requires that courts may not accept appellate counsel's *post hoc* rationalizations for agency action. The so-called "findings" upon which the Board here relies to support certain portions of the administrative decision are to be found only in the brief and arguments of counsel for the Board.

The discharge of Hutchinson was found to have been discriminatorily motivated and his reinstatement was ordered. Testimony of witnesses was presented by the companies to show: that Hutchinson, an employee of Lark, was the operator of a "continuous miner machine"; that he

had been warned about his negligence in breaking ropes and failing to shovel coal away from the "jacks"; that three ropes had been broken due to Hutchinson's negligence during the shift preceding his discharge; that he had been cautioned about broken ropes immediately prior to these last breakage incidents; and that Hutchinson had been discharged because of his negligent acts.

The examiner found merely that in January 1964 Nelson told Hutchinson that the mines were non-union, that in February 1964 Hutchinson signed a union card and that he was subsequently discharged. He adds a further finding that Foreman Boyd, who discharged Hutchinson, discussed the matter with Nelson "while interviewing other employees concerning their union activities," a finding which adds nothing and is a *non sequitur*. He then concludes:

"It is contended by Respondents that Hutchinson was discharged for carelessness in permitting ropes to be broken in connection with operations of the continuous miner machine. Under all the circumstances of this case, I find such contention to be a mere pretext and that the true reason for the discharge of Ray Hutchinson was because of his support of organizational activities by the Union."

This is the sole and complete extent of the examiner's findings, adopted without comment by the Board, to support the conclusion that Hutchinson's discharge was discriminatory.

There was no evidence that Foreman Boyd or any other management officials had knowledge of any union activities on the part of Hutchinson. General Counsel in his brief for the Board seeks to supply requisite knowledge by stating that Hutchinson told two other rank-and-file employees during a lunch period that he would like to sign a union card and that "Foreman Boyd was within hearing distance of the conversation," but Hutchinson's own testimony was to the effect that at the time of this conversation Boyd "was 50 feet" away. The Board's brief states that Hutchinson was not negligent and that he had not been warned. But Hutchinson, himself, admitted that on the day before his discharge after one breakage incident Foreman Boyd admonished him—"Be more careful and watch those ropes and don't let them slip out of the shiv." With respect to Hutchinson's discharge this is not the fact-finding required by the Act. Conflicting testimony was before the examiner and credibility issues were presented for resolution. The examiner made no specific finding that the breaking of so many ropes was commonplace, no specific finding that Hutchinson was or was not negligent in operations, no specific finding that he had or had not been cautioned, and no specific finding that the companies had knowledge that Hutchinson was lending support to union activities. These deficiencies cannot be cured and supplied by the Board's brief filed with this court. If the Board brushes aside all explanations offered by an employer to justify the discharge of employees, it must find unlawful motivation through *substantial* direct or indirect evidence. See Riggs Distler & Co., Inc. v. N.L.R.B., 327 F.2d 575, 580 (4 Cir. 1963). We have repeatedly held since the decision in Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), that in our review of Board decisions it is our *duty* to look to the record *as a whole* in determining whether there is substantial evidence to support agency findings.

Much of what has been said with respect to the discharge of Hutchinson applies with equal force to the layoff of other employees when operations in one section of the Dove mine were curtailed. The Board held that Bennett, Lester, Barton, Dixon and Osborne were discriminatorily laid off and ordered that they be made whole for any losses thereby sustained. But, again, the Board failed in its duty to establish its affirmative case.

These employees were laid off on February 10, 1964, and Dove offered a logical explanation for curtailment of the production in the "pig" section where the coal of inferior quality and below accep-

table standards was being produced. The company explained that the elimination of half of the total production of inferior coal which had been commingled with other production of higher quality would tend to cure the "dirty coal" situation concerning which numerous complaints had been received.

The majority opinion recognizes that there had been a real problem with respect to the production of "dirty coal" since October of 1963 and that several attempts to correct the situation, even to abandoning an entire section of the mine, had proved unsuccessful. The quality of the coal fluctuated and about the middle of January 1964 the quality again declined. Dove then determined to curtail production which was only another in a series of experiments to remedy the situation.

It was shown by the testimony of company witnesses that the decision was made to cut back to one-half of the labor force on each shift in the "pig" section. Foremen Sweet and Workman had discussed in advance the employees to be laid off in the event there should be a cutback and Workman had already notified Nelson as to those who should go. Bennett had repeatedly stated his intention to quit and for that reason he was one of those selected for layoff. Bennett reluctantly corroborated the testimony to the effect that he had been looking for other work. The other four were selected for layoff because they were less qualified than those retained.

Several employees working at Dove had earlier worked under Nelson at other mines and were known to have formerly been union members. Of those nine known former union adherents all but three were retained. One employee, Cameron, who had openly admitted in response to interrogation that he had signed a union card during the organizational drive with which we are here concerned, was retained. Unlike many cases involving alleged discriminatory action which have come to our attention, there was no evidence of any statement having been made by any company officer or

supervisor that the employees laid off had been selected because of real or suspected union adherence. There was no evidence that anyone in a supervisory position knew the union sympathies of any, except one, of the employees chosen for layoff. The exception was Barton who testified that he told Foreman Workman that one employee who had not signed a union card had been refused permission by Barton to ride with him in a car pool. The apparent implication was that Barton and all others who continued in the car pool had signed cards. However it would appear to be of some significance that of the car pool of eight in Barton's vehicle only two were laid off. The others were retained.

Although it is clearly apparent that the company officials knew of the union's organizational drive and interrogated a goodly number of the employees as to their union views they had received nothing but denials of union leanings except in one or two instances. The company emphatically denied knowledge of the identity of those employees who had signed cards with the one or two exceptions noted and there was no direct evidence to show that they had such knowledge. That Nelson suspected Bennett as the "instigator" of the union campaign is evidenced by the fact that Nelson accused Bennett in conversation with him. However, when vacancies later occurred Bennett was offered recall from layoff as were the other alleged discriminatees. The company offered a detailed, consistent and plausible explanation in justification of its action in curtailing production and in laying off the five employees. The examiner made no attempt to analyze or resolve the factual issues presented. In one short paragraph he resorted to a broad sweeping dismissal of all of this testimony as "mere pretext."

As a casual reading of his report discloses the examiner did not observe the injunction of either the statute or the courts to consider the record as a whole. The summary treatment even suggests an inclination toward predisposition and a conviction that the companies' conduct

"could only have been inspired by hostility to the union." See Bilton Insulation, Inc. v. N. L. R. B., 303 F.2d 98, 102 (4 Cir. 1962). In these circumstances the examiner's report and "findings," if conclusions may be loosely so characterized, should not be accorded "the presumption of correctness usually attributed to the trier of fact." See N. L. R. B. v. United Brass Works, Inc., 287 F.2d 689, 691 (4 Cir. 1961).

The efforts to dispose of labor disputes in the manner and by the courses herein employed should be discouraged and disapproved. To that end, enforcement should be denied or, at most, the case should be remanded for reconsideration with direction to proceed in accordance with the rules prescribed for proper administrative determination.