**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**SMOKY MOUNTAIN STAGES, INC., Respondent.**

**No. 15121.**

United States Court of Appeals, Fourth Circuit.

Argued April 5, 1971.

Decided Sept. 10, 1971.

Eli Nash, Jr., Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and

John D. Burgoyne, Atty., N. L. R. B., on the brief), for petitioner.

Ernest W. Machen, Jr., Charlotte, N. C. (Blakeney, Alexander & Machen, Charlotte, N. C. on the brief), for respondent.

Before HAYNSWORTH, Chief Judge, and BOREMAN and CRAVEN, Circuit Judges.

BOREMAN, Circuit Judge.

On the Labor Board's application for enforcement of its order, the sole issue is whether substantial evidence supports the Board's finding that Smoky Mountain Stages, Inc., (hereafter the Company) discharged a bus driver, Edgar Wells, because of his prounion activity rather than for cause.

Wells had been a bus driver for the Company for some twenty years prior to his discharge in early 1967. He had driven over a million "safe" miles until May of 1966, when the Company advised Wells that it had received a report from a private investigating service that Wells had been observed more than once driving his bus at excessive speeds. Wells requested and was granted permission to examine the reports, along with the investigating service's photographs showing Wells' bus traveling eighty-five miles per hour in a sixty-five mile per hour zone. Wells was placed on probation for a year by Vincent Batts, the Company's Supervisor of Drivers and Equipment.

During 1965 and 1966 Wells was an active supporter of the Amalgamated Transit Union (hereafter the Union). In fact, Wells was the person who first contacted the Union and urged it to organize the Company's employees; Wells then talked to all but three of the thirty drivers in the Company's Atlanta Division, urging them to sign union cards. The Union lost an election in 1965. However, a second election was won by the Union in December of 1966.

On January 10, 1967, Wells was preparing to depart on his regular 11:15 a. m. run from Charlotte to Atlanta. This scheduled departure time coincided with the scheduled arrival of a Carolina Scenic Coach Company bus from Raleigh. Wells asked Dispatcher Jones sometime between 11:15 and 11:30 if his bus could leave. In the hearing of two other men, Jones told Wells that he had been informed by the Carolina Scenic dispatcher that its Raleigh bus was running twenty-five minutes late so Wells should wait until the Raleigh bus arrived. At 11:30 Wells left with his bus, ten minutes before the Raleigh bus arrived at 11:40, thereby causing incoming passengers on the Raleigh bus to miss their connection and to be rerouted at considerable inconvenience to them. Dispatcher Jones reported Wells' premature departure to Batts, who in turn notified John F. Ray, the Company's Director of Safety and Legal Counsel, who normally handled investigations of complaints concerning employees. Without interviewing Wells, Batts and Ray investigated this incident and determined that it, combined with Wells' earlier disciplinary probation for speeding, called for his dismissal. On January 18, 1967, Wells was called into Batts' office and told that he was being discharged for unsatisfactory service. As was apparently consistent with usual Company policy, Wells was not then given a specific reason for his discharge.

Throughout the proceeding before the hearing examiner Wells steadfastly denied leaving the terminal on January 10 before the arrival of the Carolina Scenic bus from Raleigh, and he repeatedly asserted that he had not left the terminal until 11:45. He even testified that he knew that the Raleigh bus had arrived before his departure because he had observed the Raleigh bus driver board the bus "with his satchel" in preparation for departure on the continuation of his run. Wells further claimed that Jones had not told him anything about a connecting bus being late, and that Wells really did not know why Jones had held him beyond his scheduled departure time of 11:15. The two men who had overheard the conversation between Jones

and Wells testified that Jones had told Wells that the Raleigh bus was late and that Wells was to wait until it arrived. Wells was confronted at the hearing with his tachometer chart and sign-out chart, both of which bore his signature and which plainly showed an 11:30 departure time, but he still contended that he had not left until 11:45. The hearing examiner discredited Wells' testimony as to this incident, concluding that the evidence clearly showed that Wells had left at 11:30 and before the arrival of the Carolina Scenic bus from Raleigh.

 That the Company had a valid and proper reason to discharge Wells for cause is not open to question. However, the Board concluded that the Company discharged Wells for another reason, *i.e.*, his prounion activities. We have held that where evidence indicates that the conduct of discharged employees warranted discharge, there must be substantial evidence of an unlawful motivation for the discharges before the Board can find that an improper, rather than the proper, motivation led to the discharges. Riggs Distler & Company v. N. L. R. B., 327 F.2d 575 (4 Cir. 1963). Thus, we turn to the record to determine whether the Board's finding of improper Company motivation in discharging Wells is supported by substantial evidence. In finding improper Company motivation, the Board relied upon two bases: (1) a deviation by the Company from its usual investigatory procedures during the investigation of Wells' premature departure on January 10; and (2) antiunion statements allegedly made to Wells by Company representatives.

In finding an alleged deviation from the Company's normal investigatory procedures, the Board seized upon Batts' testimony at an earlier representation hearing. Batts' testimony there could possibly be interpreted as indicating that the Company usually interviewed employees under investigation, while in this instance Wells was not interviewed during the investigation. However, the Company points out that Batts' testi-

mony is susceptible of a different interpretation. The Company contends that Batts' testimony dealt only with the Company's usual procedure in investigating employees for possible reprimands and that, in fact, usual Company policy is to interview employees who are being investigated for possible reprimands. The Company maintains that it does not normally interview employees being investigated for possible discharges since Company policy dictates that discharged employees are not given specific reasons for their discharges. Since it is uncontroverted that the Company has the established policy of refusing to give specific reasons for discharges, its argument as to the interpretation of Batts' testimony is quite plausible. The Company further complains that the representation hearing testimony was introduced at the unfair labor practice hearing by the Board's General Counsel only to relitigate the supervisory status of the dispatchers and that company counsel did not know what was in the transcript and had no opportunity to comment upon, or offer evidence regarding, the matter of usual Company investigatory procedures.

 We have held that factual matters resolved at a representation hearing are subject to summary judgment at a subsequent unfair labor practice phase of a case where the issues are substantially the same. LTV Electrosystems, Inc. v. N. L. R. B., 388 F.2d 683 (4 Cir. 1968). However, it does not follow that either a company or a union should be bound to accept for all purposes, with no opportunity to comment upon or to rebut, testimony from an earlier representation hearing which dealt with different issues, especially where, as here, such testimony is capable of different interpretations. Thus, we find that Batts' testimony at the representation hearing as to the Company's investigative procedures does not constitute substantial evidence to support the Board's finding of improper Company motivation in discharging Wells when a

valid reason to discharge him for cause existed.

■ The second basis for the Board's finding that the Company discharged Wells due to his union activities consisted of antiunion statements allegedly made to Wells by Company representatives. Wells testified that he had told Company Division Manager Wayne Wright that he was a Union supporter; that in November of 1966 an Atlanta dispatcher, Ray Scism, told him that if he did not "leave this union alone" he was "going to get run off" since Wright would not "let you nor nobody else come in here and tear up what it has took him his life to make"; that the next day he was conversing with several men about the Union when Dispatcher Jones said, speaking of Wells, "He won't [vote for the Union], he knows better." Wells further testified that on November 17, Jones, in the presence of Batts, told Wells he "had better go upstairs and turn [his] union card in," at which time Batts allegedly said, "You had better not have a union card in your pocket." A few days later, according to Wells, Jones told him that if he "joined up with that union bunch" Jones "was going to kick [Wells'] butt," adding that "you boys don't have any business in the union * * * you will only lose your good runs to Charlotte, and some of you are going to get fired." Wells also testified that a few minutes after he was discharged on January 18, 1967, Jones told Wells that he knew he was going to be fired and asked him, "Wells, don't you wish you had took five hundred dollars for your union card? * * * You know Hutto [a driver discharged some ten or twelve days earlier] wouldn't take five hundred dollars for his."

Company witnesses Wright, Batts and Jones directly contradicted Wells' testimony concerning these alleged conversations. Wright testified that, in his conversations with Wells concerning the Union, Wells had indicated his opposition to the Union but Wright specifically denied that Wells had ever said he was a Union supporter. Batts testified

that he also thought Wells was "for the Company" and not for the Union, and Batts specifically denied telling Wells that he had better not have a union card. Jones denied the statements attributed to him by Wells, admitting only that he and Wells "kidded about the Union a lot, just ragging each other." Jones testified that Wells had said he was against the Union, and Jones claimed that he did not even know that Wells had a union card.

The record shows that Wells: (1) confronted with a report, including photographic evidence, from a private investigating service that he had been driving at a speed of 85 miles an hour in a 65 mile zone, refused to admit that he was guilty of this charge which led to his being placed on probation; (2) testified repeatedly before the hearing examiner on October 3, 1967, that he knew of no reason why he had been fired and that he had never been accused by anyone of leaving before being dispatched, yet it was later shown that on June 26, 1967, in an affidavit presented to the Labor Board, he had mentioned leaving the Charlotte terminal without being released by the dispatcher; (3) continued to assert that he had left Charlotte at 11:45 even when confronted with the original copy of his Driver's Log which he had signed and which clearly showed departure at 11:30; (4) testified that he had seen the bus from Raleigh in the Charlotte terminal before he departed, in the face of undisputed evidence that at least eight passengers on the Raleigh bus had missed their connection; and (5) asserted that the dispatcher never informed him as to why he was being held until 11:45 despite testimony of the dispatcher and two others to the contrary, to say nothing of his (Wells') own testimony at another point in the proceeding that he "was waiting on connections to come in."

The evidence was overwhelming that Wells deliberately testified falsely concerning every detail of his departure from Charlotte when he left before the connecting bus arrived. The Board

found as much. Wells was testifying concerning a matter of self-interest, *i.e.*, his restoration to his job, in the face of evidence clearly showing valid grounds for his discharge. It is within the realm of human experience that, under such circumstances and in desperation, many succumb to the temptation to give false testimony.

Wells then charges that he was discharged because of his known prounion activity. In this connection he was contradicted at every turn, not by one witness but by not less than three. According to his own testimony, remarks indicating antiunion sentiment allegedly made to him by certain individuals were made in the presence of others. He testified that on one occasion he was talking with several men about the Union when Dispatcher Jones directed allegedly antiunion statements to him, but Wells' failure to produce even one witness to corroborate his testimony is significant. He was still fighting for his job and the temptation to falsify continued unabated.

■ Normally, it is for the Board to resolve matters of credibility. But, in light of Wells' persistence in resorting to lies and misrepresentations, it was patently arbitrary and capricious for the examiner and the Board to conclude that, with respect to the alleged antiunion statements of his fellow employees, Wells was an honest, believable witness who had simply been the victim of a "faulty memory" as to the events which were shown so positively and conclusive-ly as cause for his discharge. In this case we do not think that the Board can make an honest witness of Wells who was so thoroughly discredited and who so tenaciously disregarded his sworn duty and obligation to testify truthfully.

In light of the finding that Wells testified falsely concerning a material issue, the direct contradiction of his testimony at every turn and the existence of a valid reason to discharge Wells for cause, we are not persuaded that his unsubstantiated and uncorroborated testimony as to the alleged antiunion statements constitutes substantial evidence to support the Board's finding of an improper company motivation in discharging Wells.

Absent substantial evidence to support the Board's finding of improper motivation for Wells' discharge and present a good and valid reason for the discharge, we decline to grant enforcement of the Board's order.

Enforcement denied.

CRAVEN, Circuit Judge (dissenting):

It is true that Wells' testimony as to the antiunion statements made by Company representatives was sharply contradicted. The hearing examiner resolved the credibility questions in Wells' favor,[1] which resolution was affirmed by the Board. The unstated premise of the majority opinion is that we may resolve the credibility question differently. We have no authority to do so, NLRB v. Walton Manufacturing Co., 369 U.S. 404, 408, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962);

---

1. The hearing examiner's conclusions with respect to the statements attributed to dispatcher Jones (those most damaging to the Company's position) were especially pointed:

I have little hesitancy in crediting Wells over Jones, for although Wells' memory in some respects was faulty (see *infra*), I formed the distinct impression that he was trying to tell the truth as he remembered it. Jones' demeanor, however, was that of an employee determined to testify the way best calculated to injure Wells and help the cause of Jones' employer, without regard for the truth.[1] I credit Wells over Jones, particularly with respect to what Jones said when he heard Wells was discharged, and also with respect to Jones' threats and comments to Wells as to what would happen if Wells "joined up with that union bunch."

1. This is a harsh judgment, and the Trial Examiner is well aware that he, like Jones and everyone else, is a fallible human being. I may be in error, but my considered judgment based on my observation of the two men as well as the content of the testimony is that Wells tried to tell the truth and Jones did not.

NLRB v. Lexington Chair Co., 361 F.2d 283, 288 (4th Cir. 1966); NLRB v. M & B Headwear Co., 349 F.2d 170, 173 (4th Cir. 1965); NLRB v. Lester Brothers, Inc., 301 F.2d 62, 68 (4th Cir. 1962), nor may we do so under the guise of a conclusion that the Board's finding of antiunion motive lacks substantial evidentiary basis. I think there is substantial evidence supporting the Board's finding that Wells' union activity was "a factor" in the Company's decision to discharge him, Winchester Spinning Corp. v. NLRB, 402 F.2d 299, 304 (4th Cir. 1968); *accord* NLRB v. Hanes Hosiery Division, Hanes Corp., 413 F.2d 457, 458 (4th Cir. 1969); and I respectfully dissent.