**WINCHESTER SPINNING CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 11946.

United States Court of Appeals Fourth Circuit.

Argued May 7, 1968.

Decided Oct. 8, 1968.

Frank A. Constangy, Atlanta, Ga. (Constangy & Prowell, Atlanta, Ga., and Parker, McGuire & Baley, Asheville, N. C., on brief), for petitioner.

Herbert Fishgold, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Allison W. Brown, Jr., Atty., N. L. R. B., on brief), for respondent.

Before BRYAN, CRAVEN and BUTZNER, Circuit Judges.

CRAVEN, Circuit Judge.

Winchester Spinning Corp. petitions this court for review of a decision and order of the National Labor Relations Board dated November 27, 1967, and the Board cross petitions for enforcement of the same order. The Board has found the company in violation of sections 8(a) (1) and 8(a) (3) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., with respect to coercive and discriminatory practices of Winchester in the course of an election campaign. To remedy the violations the Board has entered a routine cease and desist order and has ordered an offer of reinstatement (with back pay) to five employees found to have been discriminatorily discharged.

We enforce the order of the Board in part. We hold that insubstantial evidence supports the Board's finding that employees James B. Meece and Fred Shook Jr. were discriminatorily discharged and accordingly deny enforcement to that part of the order requiring reinstatement. The rest of the order is enforced in its entirety as we hold it is founded on substantial evidence. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Winchester moved its textile plant from Winstead, Connecticut, to Asheville, North Carolina in 1964. Organizational efforts were begun by the Textile Workers Union of America in Winchester's plant in the latter part of April, 1966, culminating in an election in August which the union lost by a vote of 39 to 38. Eight ballots were challenged, and were not opened pending disposition of the unfair labor practice charges now before us for review. Four of the challenged ballots were cast by employees (Mahaffey, Wheeler, Meece and Shook) found by the Board to have been discriminatorily discharged. Since the unfair labor practices attributed to Winchester emanated from the conduct of the election campaign, the Board ordered a second election if upon the opening of the challenged ballots it was found that the union had lost the election. This order is not before us to review for lack of administrative finality. However, since we hold that the Board's finding with respect to the discharge of Meece and Shook is founded on insubstantial evidence, we direct that their ballots not be counted in the election returns.

Without admitting that it is in violation of the Act, Winchester concedes that the record contains substantial evidence to support some of the section 8(a) (1) violations found by the Board. Illustrative of these, the Board found that supervisor Emory told employee Mahaffey that the plant office had instructed him "to find out what he could in the winding department," and asked Miss Mahaffey whether she knew of union activity in that department Supervisor Callahan told employee Penland that two employees (Mahaffey and Rollins) who had been discharged were discharged for attending "too many union meetings." In July, after the union had filed an election petition, supervisor Crisp warned employee Shook that the company was looking for an excuse to fire him because his name was "on the [union] committee list." Whenever an employee was discharged whose name appeared on the posted committee list, the name was pointedly struck from the list by Plant Manager Moses. Additionally, Crisp testified that Moses instructed the plant supervisors that if they could "discharge or release any one for just cause who had some affiliation with the union, to do so." Thus it is fair to conclude that the company was infected with anti-union animus, a factor relevant to our review of the Board's contested findings.

## THE CONTESTED § 8(a) (1) VIOLATIONS

■■■ Early in May supervisor Emory asked employee Blanche Rollins: "What do you think about the Union?" Although Miss Rollins had previously signed a union authorization card she replied that she did not know much about it. The Trial Examiner found that Emory's remark constituted an unlawful interrogation. We hold that in the context of demonstrated employer hostility to the union the Examiner's finding was not unwarranted. Emory did not indicate to Miss Rollins that he was acting in any capacity other than as a representative of management. The employee's response may be interpreted, in the light of her having signed up with the union, as indicating a cautious apprehension of reprisal. It is enough that employer interrogation has a tendency to inhibit the free exercise of rights protected by the Act. N. L. R. B. v. Associated Naval Architects, Inc., 355 F.2d 788, 791 (4th Cir. 1966). Real or presumed injury to employee organizational rights must in all section 8(a) (1) cases be balanced against legitimate business interests of the employer in his conduct,

*American Ship Bldg. v. N. L. R. B.*, 380 U.S. 300, 339, 85 S.Ct. 955, 13 L.Ed.2d 855 (1964) (Goldberg, J., concurring), and we perceive no permissible business interest of the Respondent fostered by probing into the union sentiments of Miss Rollins.[1] While we think the violation was at the most a marginal one, it is not our function to review the Board's findings *de novo*. We hold that the substantial evidence test is met.

■ Conner, an active union adherent, was discharged on July 1. According to the credited testimony of employee Shook, the next day Shook remarked to Plant Manager Moses, " * * * I see that you got rid of Martin Conner yesterday," whereupon Moses replied that Conner had been working for the interests of the union and not for the interests of Respondent. Moses then asked Shook: "Are you working for the interest of the company?" Shook stated that that was for Moses to find out. We think, again in the context of demonstrated anti-union animus, that the remarks of Moses represented unlawful probing into union sentiment.[2] In reviewing the Board's finding that Respondent violated section 8(a) (1), we hold that the substantial evidence rule is satisfied.

■ On May 11, 1966, Respondent posted a notice in its plant which, in material part, provided:

"It is important that our plant and the plant's premises be kept clean at all times. Therefore, no notices, posters, stickers or similar material may be posted at any place on company property, except on official bulletin boards, and then only after approved by management. No such notice may be distributed or littered on any part of the Company premises.

\* \* \* \* \* \*

"Failure to comply with the above rule is sufficient cause for dismissal." It is settled law that a plant no-solicitation, no-distribution rule is presumptively invalid if it applies to non-working areas and non-working hours. *Republic Aviation Corp. v. N. L. R. B.*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372, 157 A.L.R. 1081 (1945); *N. L. R. B. v. Lexington Chair Co.*, 361 F.2d 283 (4th Cir. 1966). Instantly, the only objectionable

---

1. Employer interrogation is generally a dangerous practice. Since it is the prerogative of the Board to determine the majority/minority status of the union, ordinarily management has no legitimate business interest in probing into union sentiment. One common exception is the case where union representatives demand recognition on the basis of a claimed card majority, thus giving rise to an employer duty to bargain if the union in fact has majority status. See Bok, The Regulation of Campaign Tactics in Representation Elections under the National Labor Relations Act, 78 Harv.L.Rev. 38, 107 (1964). The Board at one time adopted a per se rule, that employer interrogation is an 8(a) (1) violation, Standard-Coosa-Thatcher, 85 N.L.R.B. 1358 (1945), but after being rebuffed by several circuits, e. g., N. L. R. B. v. England Bros., 201 F.2d 395 (1st Cir. 1953), abandoned it. The norm now is to examine the circumstances of interrogation on a case-by-case basis to determine if coercive influences are present. To this end the Second Circuit has adopted (Bourne v. N. L. R. B., 332 F.2d 47, 48) five checkpoints:

"(1) The background, i. e. is there a history of employer hostility and discrimination?
"(2) The nature of the information sought, e. g. did the interrogator appear to be seeking information on which to base taking action against individual employees?
"(3) The identity of the questioner, i. e. how high was he in the company hierarchy?
"(4) Place and method of interrogation, e. g. was the employee called from work to the boss's office? Was there an atmosphere of 'unnatural formality'?
"(5) Truthfulness of the reply."
Professor Bok, supra, suggests that employer interrogation is on doubtful ground unless three factors are present:
(1) The employer has a valid business purpose for obtaining information concerning union strength;
(2) This purpose is communicated to the employee; and
(3) The employee is advised that no reprisals will be taken on the basis of his answer.

2. See note 1 and accompanying text.

portions of the notice are these words in the first paragraph: "and then only after approved by management" and "distributed or." Respondent has shown no special circumstance for us to weigh against the injury presumptively done to organizational rights by such a rule. Therefore we concur in the Board's finding that the promulgation of the rule violated section 8(a) (1), insofar as it includes the objectionable words just mentioned.

### THE § 8(a) (3) VIOLATIONS

Employees Mahaffey and Rollins were union activists. On June 17 both were notified of their discharge, allegedly for excessive absenteeism. The Board rejected this explanation as pretextuous and found that both employees had been discriminatorily discharged. Evidence of unlawful motive later appeared (according to the credited testimony of employee Penland) in the admission of Supervisor Callahan to Employee Penland that Mahaffey and Rollins had been fired for attending "too many union meetings." Additionally, it is uncontradicted that on April 21 or 22 Supervisor Emory warned Mahaffey that if management learned of her attendance at union meetings she would "no longer be an employee of Winchester."

 It is not disputed that Mahaffey and Rollins were guilty of absenteeism. However, Respondent's attendance records show that other employees, who were not discharged, had similar or worse absentee patterns.[3] Mahaffey and Rollins were known to management as union activists. Respondent's absenteeism policy was not uniformly enforced as inexplicably other employees guilty of the same offense were retained. Mindful that union activity does not insulate an employee from ordinary discipline, we think in the context of demonstrated anti-union animus, and in the light of unlawful motive supplied, supra, by supervisor Callahan, the Board was within its prerogative in rejecting Respondent's business explanation. To support a finding of a section 8(a) (3) violation, it is enough that a discriminatory motive was a factor in the employer's decision. N. L. R. B. v. Dove Coal Co., 369 F.2d 849, 852 (4th Cir. 1966). Therefore, we hold that the substantial evidence rule is satisfied in respect of the Board's finding that the two employees were discriminatorily discharged.

Wheeler, a union activist, was discharged on August 16 (a week before the representation election) for the assigned reason of "continual inability to perform his job," culminating in an incident on August 15 when Wheeler, by his own admission, permitted the level of yarn in his hopper to run low.[4] Former supervisor Shelton testified that Wheeler was in the habit of failing to maintain the yarn in his hopper at the prescribed level and Plant Manager Moses testified that this was the reason for his discharge. However, employee Ellis, a maintenance man who serviced Wheeler's machine, testified that except for the August 15 incident, he had never seen Wheeler's hopper run low. Wheeler gave testimony to the same effect. A further dereliction ascribed to Wheeler was that he habitually failed to observe whether his machine needed oil, with the result that on at least one occasion the machine's engine burned out.

In April Wheeler had sustained an occupational back injury. According to the testimony of Moses, Wheeler had been marked for discharge (for his alleged incompetence) sometime in June,

---

3. The record shows that Mahaffey was absent 12 days in May and 3 days in June and that Rollins was absent 2 days in May and 7 days in June. The company's attendance records for May and June show, for example, that Dollie Bartlette was absent 7 days in May and 4 in June; Wilma Evans had 9 absences between May 23 and June 30; Gladys Robinson was absent all but 2 days in May, and worked only 1 day between August 11 and 25; Linda Wilson worked only 6 days between June 9 and June 30.

4. Failure to maintain the hopper yarn-level results in the production of underweight, hence low grade, yarn.

with the date of the discharge to be delayed until the extent of his disability became known. Moses testified that this occurred sometime in mid-July and that Wheeler's discharge was further delayed because " \* \* \* you don't walk up to a man and say, 'We find out you are physically able to do the job, you are fired now.' " Presumably Moses intended to wait for a new manifestation of Wheeler's incompetence which did not occur until the August 15 incident. The Trial Examiner made a credibility resolution against Shelton and Moses partly on the basis of demeanor. The Examiner also reasoned that if management had to wait several weeks (from sometime in July to August 15) to observe a new manifestation of incompetence then Moses and Shelton must have been exaggerating in depicting Wheeler's derelictions as "continual inability to perform the job." In addition, it is not clear on the record whether Wheeler's other alleged propensity—failure to keep his machine oiled resulting in its engine's burning out—was properly attributable to him or to one of the other two shift operators of the machine.

 The undisputed testimony (Shelton and Ellis) in the record is that other employees guilty of the August 15 incident—permitting the hopper to run low—were not fired. The Trial Examiner made a finding of disparate treatment on the basis of discrediting the testimony of Moses and Shelton as to the frequency of Wheeler's derelictions. Having rejected Respondent's business motive on the basis of credibility, the Trial Examiner concluded that Wheeler was discharged for his union activity. Bearing in mind that the weight to be given the evidence is to be determined by the Board, we do not think that the Board was unwarranted in inferring a discriminatory motive from the discharge of a union activist one week before the election, particularly when other employees guilty of the same infraction were not discharged. We do not try

the question *de novo*. Our inquiry is finished when we determine that there is substantial evidence to support the Board's finding.

Employees Meece and Shook were members of Respondent's dye house crew. Prior to the union election campaign, Respondent had contracted out a substantial part of its dyeing operation to Model Dye House, in Sumter, South Carolina, and it is agreed that Respondent, for business reasons, made a decision in the Spring of 1966 to shut down its own dyeing operation and contract out all the work to Model. The business judgment of Respondent was that its dyeing work could be performed more economically by Model than by itself, and on May 27, 1966, Respondent authorized McKittrick Company to place its dyeing equipment on the market. The projected closing date of Respondent's dye house was either whenever the equipment was sold, or in the Fall of 1966,[5] when the annual slack season began. On July 15, for reasons that are disputed, Winchester decided to advance the closing date of the dye house to August 1, and, on that date, Meece and Shook were discharged. Both employees were union activists.

 The Board found that accelerating the closing date to August 1 was done for discriminatory rather than business reasons—that it was prompted by a desire to get rid of two union adherents shortly before the election. We do not think this finding is supported by substantial evidence on the record as a whole.

Winchester's witnesses testified and presented documentary evidence to the effect that a decline in the number of orders requiring dyeing was anticipated to occur, and did in fact occur, in the Fall of 1966. The decision to advance the closing date to August 1, according to management, was made because of the existence on July 15 of only a two-week backlog of dyeing orders, and a projection which indicated that the dye house crew would have little or no work during the latter part of the summer. It is not

---

5. The testimony is in conflict on this point. However, it is conceded that the initial decision to shut down was made for legitimate business reasons.

controverted that Winchester on July 15 had only a two-week backlog of orders.[6] The Trial Examiner, however, rejected this business reason, and the Board adopted his findings, on the basis of statistical evidence indicating that Winchester received substantially the same number of dyeing orders in June, July and August of 1966 as it had for the same months in 1965, and even though on July 15 only a two-week backlog of orders existed it could not have been anticipated that the late July and August orders would decline below the previous year's level.

Winchester contends, however, that all of the late July and August orders for 1966 consisted of "repeats," that is, orders which had previously been dyed at Model and could only feasibly be done by Model again,[7] and therefore the company's July 15 projection was borne out. The only evidence in the record in point is the testimony of Respondent's president, Gaylord:

"Q. On August 1, did you have any orders on hand which had not been placed, that could have been dyed in the Asheville plant other than orders that you had sent to Model Dye and were repeats of previous dye orders that you had sent to Model?

"A. We had none.

"Q. How long was it before you received any new orders which could have been dyed in the Asheville plant that were not repeat orders to Model?

"A. I would say at least a month went by wherein no orders were received which could not be dyed at Model.

"Q. If the dye house at Asheville stayed open after August 1, what would have been available for the employees in the dye house?

"A. None. [Nothing]

"Q. For approximately how long a period of time?

"A. I would estimate a month."

■ The Trial Examiner and the Board elected to ignore this testimony. Noting that Model had done only a portion of the previous year's orders the Board reasoned that it could not have been anticipated on July 15 that all of the late July and August orders would consist of Model "repeats." We think this is impermissible speculation. However prescient it may seem that on July 15 Respondent could have anticipated this result, the fact remains that the only relevant evidence in the record is that it did occur. Record evidence which detracts from the Board's finding is properly considered by us. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S. Ct. 456, 95 L.Ed. 456 (1951).

■ An employer is free to discharge his employees for business reasons even though an incidental effect is the removal of potential union votes in an oncoming election. Where an asserted business motive is discredited, or contradicted by substantial evidence, the Board is free to treat it as pretextuous and infer discrimination on account of union activity. However, as it is in the instant case, in the absence of an adverse credibility resolution by the Trial Examiner, or contradictory evidence, the Board may not make such an inference. "If discrimination may be inferred from mere participation in union organization and activity followed by a discharge, that inference disappears when a reasonable explanation is presented to show that it was not a discharge for union membership." N. L. R. B. v. United Brass Works, Inc., 287 F.2d 689, 693 (4th Cir. 1961).

The order of the Board is enforced as modified.

6. Winchester's president, Gaylord, testified that the normal backlog for this period amounted to six to eight weeks' work in orders requiring dyeing.

7. On orders it had previously done, Model had proper dye shades already composed. Even if Model were willing to supply Respondent with its formulas for repeat orders, the result would still be impracticable for the materials used by each dye house are unique. Composing the correct shade of dye involves protracted laboratory work, often two weeks or more in length. Therefore all "repeat" orders were, as a matter of course, sent to Model.