**J. A. HACKNEY & SONS, INC.,**
**Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent.**

**No. 13572.**

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 8, 1970.

Decided May 20, 1970.

Frank A. Constangy, Atlanta, Ga. (Robert L. Thompson, and Constangy & Prowell, Atlanta, Ga., on brief), for petitioner.

Lynn D. Poole, Atty., National Labor Relations Board (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Nancy M. Sherman, Atty., National Labor Relations Board, on brief) for respondent.

Before HAYNSWORTH, Chief Judge, and BRYAN and WINTER, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge.

The National Labor Relations Board's finding that J. A. Hackney & Sons, Inc. violated the Act, and the company's response of innocence, make the issue tendered here for decision. The Board petitions for enforcement of its remedial order; the accused petitions for its annulment. We grant each in part.

The misdoings, termed as unfair labor practices, consist first of interference with the employees' formation of a union, and then of discrimination in the discharge of 41 employees on July 11, 1968 because of union interest. § 8(a) (1) and (3), respectively, 29 U.S.C. § 158 (a) (1) and (3).

Hackney's business is the manufacture of truck bodies for carrying glass beverage bottles. The plant is at Washington, North Carolina, and the corporation has that State's charter. For eight successive years the company had enjoyed substantial growth, a 20% annual increase, a high record in 1967 of $2.9 million in sales and a 1968 budget of $3.1 million.

However, in February 1968 a strike by the Glass Blowers' Association caused a costly business decline in the glass industry. The impress on Hackney, it contends threatened its life, and thereafter livelihood depended upon sharp curtailment of operations and employment. This struggle, it continues, and not union antipathy, accounted for the terminations.

I. In our judgment the evidence sustains the finding of the Board of 8(a) (1) violations. Unionizing of the plant was initiated on May 21, 1968. Unusual oversight and interrogations of the employees by company officers, or with their acquiescence, were instituted. The survey and canvass definitely overstepped the employer's prerogatives. Further details of the excessive activities would add nothing.

II. The more difficult resolution relates to alleged discrimination in the release of the 41 employees. On May 23, management explained to the employees the company's precarious economic position. However, it assured them from time to time of a desire to retain the entire work force despite a possible reduction in hours of production. The Board contrasts these protestations with the remarks accompanying the July 11 terminations. It saw significance in the company's insinuations of the employees' disloyalty and ingratitude. The discharge announcement blamed them for the company's resort to the releases. The company said that this decision was, in part at least, forced upon it by the workers' slow down in production.

However, the Board inferred from these accusations and from the 8(a) (1)-forbidden activities an ulterior motivation for the discharges. It imputed the company's whole conduct to the impending possibility of success in the pro-union movement. The Board's conclusion was that this unfriendly attitude and these acts of the company tainted and rendered the discharges unfair labor practices. On the other hand, the company insisted that the primary motivation was economic and not of anti-union prompting.

The uncertain waters and shoals of 8(a) (3) were charted with some definiteness in American Ship Bldg. Co. v. NLRB, 380 U.S. 300, 85 S.Ct. 955, 13 L. Ed.2d 855 (1965). There the Court said, at 311, 85 S.Ct. at 963:

"Under the words of the statute there must be both discrimination and a resulting discouragement of union membership. It has long been established that a finding of violation under this section will normally turn on the employer's motivation."

See also NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 87 S.Ct. 1792, 18 L. Ed.2d 1027 (1967).

In opposition to the Board's evidence on this head and in refutation of any sinister motivation, the facts adduced by the company indubitably reveal genuine economic distress at the time of the discharges. Customers of Hackney have a seasonal operation. New truck bodies are ordered in the winter for use in the spring—the inception of the bottlers' heaviest demand. Because of the glassblowers' February 1968 strike, the bottlers were not in the market for delivery vehicles. True, the tie-up was brought to a close on March 22, but the bottling companies realized that full production in the glass industry would require months, and would not become normal until the summer of 1968—beyond the peak of the bottlers' needs. Hence they were not seeking truck equipment in the spring.

In April, Hackney's sales manager became apprehensive because the backlog of orders was only one-half of what it had been in the corresponding 1967 period. He forecast that the company for the rest of the year would not exceed a call for more than 14.5 bodies per week. Formerly it had been 30.

Responding to this existing and growing depression, the company at once began cancelling its purchase orders for steel and aluminum. No substitutes were employed for those workers who for one reason or another left their jobs. On or about June 15, the company in a further endeavor to meet the emergency reduced the work week from 50 to 45 hours.

Plant operation cost $53,000.00 weekly, but the June 25, 1968 report reflected that income had fallen to $43,698.00. In the previous week it was also below the breakeven point, although in the three earlier weeks it had exceeded the minimum by $6,000.00.

At this June report, the company had on hand 34 trucks. These meant only slightly more than a week's work for the production employees. Notably the corresponding figure in 1967 had been 238. Records also disclosed a considerable drop in man-hour productivity. Realizing that another cut in hours would generate dissatisfaction, the employer found that it would have to reduce its payroll by 41. One responsible company official testified:

"But by the end of June we knew what the situation was, and by the end of June we had quite simply run out of orders and trucks and we were faced with the prospect of literally running [out] of work, and the lay off, quite simply, was effected in order to reduce each and every department in our plant to the staffing level that would be required to exactly equal our sales projection of 14.5 bodies a week."

The sincerity of the company is demonstrable. The dischargees were not replaced. Six offers of reemployment were extended, but not all of them were filled. The releases included union as well as non-union men. Those laid off were selected by the production superintendent and his assistant from a semi-annual employee rating system begun in 1965. It graded a worker as above or below the composite average of his department.

The averages used instantly were those computed in the last weeks of December 1967 and June 1968. Of the 41 dropped, the first to go had a score of 1.2 below the average, then went those with the next lower average, and so upwardly in turn. This process accounted for 35, with the remaining six chosen after conferences of the foremen, the production superintendent and his assistant. Incidentally, we observe nothing discriminatory or otherwise unfair in picking the dischargees.

■ Our review of the entire record discloses that the finding of an impermissible motive is without substantial support. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Against the overwhelming evidence of an economic motivation for the discharges, as well as the non-discriminatory manner in which they were effectuated, the inferences which the Board drew from the 8(a) (1) activities and from the announcement of July 11 cannot stand. See Sterling Aluminum Co. v. NLRB, 391 F.2d 713, 717–718 (8 Cir. 1968).

Ultimate decision, then, must be made in the manner enunciated in NLRB v. Erie Resistor Corp., 373 U.S. 221, 228–229, 83 S.Ct. 1139, 1145, 10 L.Ed.2d 308 (1963), as follows:

"[s]uch situations present a complex of motives and preferring one motive to another is in reality the far more delicate task * * * of *weighing* the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner and of *balancing* in the light of the Act and its policy the intended consequences upon employee rights against the business ends to be served by the employer's conduct." (Accent added.)

We note that discharges in circumstances starkly resembling those of this case have been squarely upheld in this court as not discriminatory conduct. Winchester Spinning Corp. v. NLRB, 402 F.2d 299, 305–306 (4 Cir. 1968). With like forthrightness NLRB v. Kingsford, 313 F.2d 826, 829 (6 Cir. 1963) also acquitted the employer, saying: "Business changes effected for economic reasons are not proscribed by the Act and do not constitute unfair labor practices."

Here, too, the final balance must, in our view, be struck in favor of the employer. Imminent failure, if not bankruptcy, of Hackney would reduce the employees' right to organize to a Pyrrhic success indeed. Avoidance of this plight is not barred by the Act. See NLRB v. Mackay Radio & Tel. Co., 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381 (1938).

That part of the Board's order relating to the 8(a) (1) violations is enforced; that part relating to the 8(a) (3) charge is rejected.

Order enforced in part, and refused in part.

HAYNSWORTH, Chief Judge (concurring).

Hackney's statements and speeches would abundantly justify a finding that the discharges were discriminatory were it not for the fact that by July 11, 1968, when the discharges occurred, there was no other reasonable alternative.

Most of us are optimists, and it is not surprising that, in the late spring and early summer, management clung to the hope that the volume of business would pick up in mid or late summer and that the interim could be bridged by a modest reduction in hours of work without a reduction in the work force. The reduction in the work week from fifty hours to forty-five hours and consideration of a further reduction to forty hours are consistent with that optimistic view.

By July 11, however, it was apparent, (1) that the volume of the work had been reduced by fifty per cent, and (2) there was no reasonable prospect of its increasing in the foreseeable future. The dreary prediction was confirmed as the subsequent months rolled by. In mid-July, therefore, the only possible alternative to a reduction in the number of employees was a reduction in the hours on the order of the reduction in the volume of work, that is fifty per cent.

No one contends that a reduction of the work week to twenty-five hours for an extended period of indefinite, if not permanent, duration was a reasonable alternative or that it could have been accomplished without a complete destruction of the moral and efficiency of all employees. What is suggested, if somewhat vaguely, is that the work week might have been reduced to approximately forty hours, but there is no room for argument on this record that the volume of work on hand and in prospect could begin to support such a work week. It would have been the equivalent of the maintenance of a work force sixty per cent greater than was necessary; it could have had no other consequence than early cessation of all operations and possible bankruptcy, as my brother Bryan points out.

If there had been any other reasonable alternative open to management in mid-July, a finding of discrimination would have been abundantly supported by management's outrageous declarations; the choice between the two could readily be said to have been influenced by management's purpose to defeat the Union's organizational effort. When the low volume of work, which resulted from fortuitous circumstances beyond management's control, left it with no alternative, however, its resort to the one step open to it to meet the radically altered business conditions cannot reasonably be said to have been influenced by a proscribed collateral purpose.

A permissible finding that an employer wished to be rid of a particular union adherent would not warrant a finding of discrimination in his termination, subject to a veteran's statutory re-employment rights, when he was drafted into the armed forces. However reprehensible the employer's purpose and the language that evidenced it, the termination would have been demonstrably for a nondiscriminatory reason, just as was the reduction in the work force here when the employer had no choices to exercise.

There might remain a possible question of discrimination in the selection of the forty-one employees to be released. Discrimination there would have been a violation of § 8(a) (3) of the Act entitling the discriminatees to reinstatement, though the decision to reduce the work force was beyond the statute's reach. The Board, however, found no discrimination in the selection of the forty-one employees and the bases of their selection appear to support the conclusion that they were not discrimi-

natory. No question on that score, therefore, is before us.

Since I find in this record no basis for any other conclusion than that the employer was compelled by economic conditions to reduce the work force, I join my brother Bryan in the conclusion that the step cannot be attributed to the employer's anti-union purpose, and, hence, cannot be said to have been discriminatory within the meaning of § 8(a) (3).

WINTER, Circuit Judge (concurring in part and dissenting in part).

I agree that the Board's finding that the company violated § 8(a) (1) has ample support in the record, but I think that the same is also true with regard to its conclusion that there was a § 8(a) (3) violation. The evidence of record supporting the latter follows:

The union began its organization drive on May 21, 1968. Within days the company had recruited an employee, Chester Webb, and, by reminding him of past financial favors, persuaded him to attend union meetings, report what transpired and ascertain and report who attended and who signed union authorization cards. The downturn in the company's business because of the glass industry strike had begun in February, 1968. By April, 1968, the company was aware that through August, 1968, production necessary to fill orders would be only 14.5 truck bodies per week, about half plant capacity.

With this knowledge the company's executive vice-president and general manager, James A. Hackney, III, addressed all employees. Hackney made this speech just after Webb had been recruited. He told employees that strikes brought on by unions in other industries had hurt the company's business and that "we do not have a union here, and we hope we never will." He assured them that if there was need for the company to reduce production "we will reduce the work week if necessary rather than lay off personnel. We feel that each employee is a valuable member of our production team, and we do not want to lose anyone." Hackney also held out the prospect of a wage increase.

Webb fulfilled his role as informer, even to the extent of proselytizing, at the company's instigation, the union secretary, James Edwards, to aid him in informing the company about the union. Contemporaneously with Edwards' first report to the company as union informer, Hackney again addressed the employees cautioning them against union activity, including the admonition that if they ever went on strike over contract demands they could and probably would be replaced so that their jobs would be lost forever.

On June 5, shortly after Webb and Edwards had furnished the company with a list of those employees who had attended a union meeting, Hackney again delivered a speech to the assembled employees. He referred to a statement of a union representative that he [Hackney] could afford higher wages and told them that he was well enough off financially "to padlock the plant and hunt and fish the rest of my life * * *." On June 6, after another union meeting the previous night, Webb delivered to the company a list, compiled by Edwards, of the employees attending that meeting, and the production superintendent, Holmes Boyd, told Webb to tell employees, without revealing the source, that "if they want to keep working here, they had better get their [union] cards [back]."

In accordance with Hackney's earlier prediction, the company reduced its workweek from 50 to 45 hours on or about the workweek ending June 25, 1968. At about the same time Hackney asked Boyd and Boyd's assistant to devise a plan to reduce each department to a level which would produce 14.5 bodies per week—the level of production which had been anticipated two months earlier. Boyd, whose anti-union statement has been noted, and his assistant formulated a discharge list from an average of the last two production ratings.

Notwithstanding his unannounced plan to discharge employees, Hackney made another speech on July 3 about a revised wage and job progression plan to become effective July 17. Because of a general upgrading of all jobs, wage increases of from 5 to 27 cents per hour were granted to all employees. As part of the announcement, Hackney assured all employees, according to the testimony of one of the employees present, "there was no cause for alarm, that the company had never had a layoff and they didn't intend to have one now."

Then on July 11, Hackney made another speech, announcing the mass discharge of the 41 employees on Boyd's list. Beginning with the opening comments that previously he had spoken "nice and gently" and "didn't quite use language you understand," Hackney asserted "today I don't intend to make that mistake. You're going to get the message loud and clear, in terms that even the thickest of you will understand." Stripped of the vulgarities, obscenities and blasphemies with which it was liberally larded, Hackney's speech accused employees of dissatisfaction with their working conditions, feeling that they were underpaid and believing a "line" about how badly off they were. Hackney referred to a former employee and head of the union in-plant organizing committee who believed "that line of crap" but who had found out that "the world outside was cold and hard" and within "one week he asked for his job back." Hackney fully disclosed that the company's motivation for the discharge was retaliation in the comment "We had a decision to make. Work is slack, and we were faced with the choice of whether to cut hours or to cut people. But, *some of you made that decision for us.*" (emphasis supplied.) He also answered the majority's finding of the company's purity of motive in discharging some 12 non-union employees by his statement "there's no point in crying to me that you are really one of the good guys. When you play with fire, you get burned." [1]

To complete the picture and further drive his message home, the record contains testimony that Hackney confided to retained employees the next day that any discharges could have been avoided by reducing the workweek to 40 hours and by reducing salaries.

To me this evidence provides a substantial basis for the Board's conclusion that the discharges were motivated by anti-union bias. I do not question that the company's economic situation was deteriorating. But it was aware of this reality during the entire period that Hackney repeatedly assured employees that their employment was not in jeop-

---

[1]. My brother Haynsworth asserts that the board found no discrimination in the selection of the 41 employees who were discharged. At most there was a non-finding. On compelling evidence, the trial examiner found that the June 1968 ratings, which when averaged with the December 1967 ratings were the purported basis of selection for those to be discharged, were not reliable. Because the board found that "the decision to reduce the work force was motivated by the recent union activities of his employees and not by Respondent's economic straits," it found "it unnecessary to rely on the Trial Examiner's apparent further finding that there was a discriminatory selection of the employees discharged."

I would be cautious in rejecting the trial examiner's apparent finding so as to conclude that there was non-discriminatory selection of those to be discharged. When the June 1968 ratings were made the unionization campaign was under way and the company had adopted a vigorous anti-union policy. The actual ratings were made by supervisory personnel who actively engaged in threats, coercion and other anti-union activity, and they well knew the names of employees who attended union meetings and who signed union cards. Of those discharged, 9 were not rated, 4 had a higher rating in June than in December, and one of these 4 had a rating above his departmental average. By contrast, 2 employees were retained whose June ratings were lower than their December ratings. If discharges were made on the basis of the December ratings, which were made before any union and anti-union activity had begun, 18 of the 41 would not have been discharged.

ardy. The company's announced anti-union bias, its intimate knowledge from its spies of who was interested in joining a union, as well as who had actually signed a union card, its detailed knowledge of the attempts to organize notwithstanding its expressed disapproval, its grant of wage increases in spite of substantially reduced production, its use of discharges, rather than layoffs or further reductions in working hours, and Hackney's speech of July 11 in announcing the discharges, all lead to the conclusion that, after its attempts to chill unionization had proved abortive, the company seized upon the economic situation to justify retaliatory massive discharge so as to forestall any exercise of employees' § 7 rights for the foreseeable future.[2] To say, as does the majority, that the Board's predicate that anti-union discrimination was a motivating factor in the discharges does not have substantial support in the record considered as a whole does violence to Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Under our previous decisions if anti-unionism is a factor in a discharge, this is enough to render the discharges discriminatory and in violation of § 8(a)(3). NLRB v. Hanes Hosiery Division, Hanes Corp., 413 F.2d 457, 458 (4 Cir. 1969); Winchester Spinning Corp. v. NLRB, 402 F.2d 299, 304 (4 Cir. 1968); NLRB v. Dove Coal Company, 369 F.2d 849, 852 (4 Cir. 1966). We should not now reverse our course.

I respectfully dissent, from the majority's failure to sustain the Board in the § 8(a)(3) aspect of the case.

---

2. To avoid the substantial evidence of anti-union animus, the opinion of my brother Haynsworth asserts that the discharges were the only reasonable solution for the company's diminished need for production. From that premise, his opinion concludes that the sole reason for the discharges must have been a permissible business judgment. I find this reasoning fallacious. The significant fact is that in Hackney's view there were other alternatives. There is no warrant to disregard his views since the question before us is not what his actual motives should have been but what his actual motives were. My brother's logic overlooks the timing of the discharges and is inconsistent with the anti-union statements accompanying their announcement, the post-discharge disclosure that they could have been avoided, the resort to discharges rather than layoffs, and the pay raise to retained employees effective one week after the discharges.