The **BLACK HAWK CORPORATION,** Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 13746.

United States Court of Appeals, Fourth Circuit.

Argued May 5, 1970.

Decided July 27, 1970.

As Modified Sept. 10, 1970.

Winter, Circuit Judge, dissented and filed opinion.

W. S. Blakeney, Charlotte, N. C. (Blakeney, Alexander & Machen, Charlotte, N. C., on brief), for petitioner.

Robert E. Williams, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and William F. Wachter, Atty., National Labor Relations Board, on brief), for respondent.

Cornelius J. Collins, Jr., New York City (Patricia E. Eames, Gen. Counsel, Industrial Union Department, AFL–CIO, and Textile Workers Union of America, AFL–CIO, on brief), for intervenors.

Before BOREMAN, BRYAN and WINTER, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

Here in question is the National Labor Relations Board's finding that Black Hawk Corporation violated section 8(a) (3) and (a) (1) of the Labor Relations Act, 29 U.S.C. § 158(a) (3) and (a) (1), by the 1967 layoff of 17 employees. Specifically, the Board found they were thus penalized because of their union leanings and in order to affect the outcome of a pending representation election. The decision is attacked by the Company as lacking in substantial proof. We agree with this contention and decline to enforce that part of the Board's order. This disposition renders moot the plaint of leniency in the remedy suggested by the intervening unions, the Industrial Union Department, AFL–CIO and the Textile Workers Union of America, AFL–CIO.

The Black Hawk Corporation, located in Greenville, South Carolina, is a wholly-owned subsidiary of J. P. Stevens & Co., Inc. It was established in 1960 as a warehouse for the storage and handling of baled cotton to be used exclusively by Stevens' twenty-one consuming plants in North and South Carolina, Georgia, and Tennessee. While Stevens uses some independently owned warehouse facilities, it is uncontested that throughout the middle of 1967, Black Hawk, as Stevens' only central cotton storage place, processed the bulk of Stevens' cotton. The operation consists of weighing the raw material on arrival, and testing and classifying it before consolidation into large lots suitable for shipment to the consuming plants.

While the warehouse supply remains fairly constant, the inbound shipments vary during the cotton year. Beginning in late August, volume increases, with the acme in December and January. Ordinarily, there is a slack period from April or May until early August. This fluctuation has caused Black Hawk periodically and correspondingly to adjust the number of its employees. Since 1964, when the warehouse was enlarged, Black Hawk has had as many as 71 people working there during the heavy season. For the three years prior to 1967, the force was reduced for want of work at an average rate of 25 employees annually.

In 1967 there was a steep decrease from 51 to 31 workers in the warehouse, where employees were inclined to unionization, and an increase of four workers in the shop, where a converse sympathy prevailed. These variations occurred during the nine weeks beginning with the charging union's petition for an election on August 22 and ending with the balloting on October 25. The precipitateness of the diminution and its timing occasioned the complaint. Noteworthy here, however, terminations were as-

**902**

signed in inverse seniority order, without reference to activity or disinterest in the organization drive.

Opposing the charge, Black Hawk pleaded economic justification. Cotton is purchased on the open market, and in anticipation of a "short crop" and in the face of new Government production controls, Stevens bought unusually high amounts in late 1966 and early 1967, long before it knew of the Black Hawk union movement which began in June 1967. As a result, in 1967 the usual April-May slow season did not arrive until September. By that time, Black Hawk argues, independent warehouses which Stevens rented in Gulfport and Clarksdale, Mississippi had accumulated cotton sufficient for consolidation into lots large enough for direct consignment to Stevens' manufacturing plants. Hence, Black Hawk maintains, shipment to it would have been both unnecessary and uneconomical.

The Board rejected this contention, saying that while Stevens had previously used the Gulfport and Clarksdale facilities, nevertheless it had shipped cotton from them through Black Hawk until the fall of 1967. The Board found this rescheduling of an "established practice, whether it had been an uneconomical one or not," to constitute a component of the motive requisite to an 8(a)(3) violation. Other ingredients included Stevens' history of union hostility,[1] its discovery of the currency of the movement, and the hiring of shop employees, thought to be aligned with the Company, when the warehouse workers were discharged.

■ Decision of the controversy then comes to the ascertainment of whether the proof measures up to the substantiality required to enforce a Board finding and order. In assaying the evidence, we are mindful that the Board's choice between two fairly conflicting views may not be displaced. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). However, we are not mindless that our duty also is to gauge the evidence "in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Id. In this, the test is whether

"the inferences on which the Board's findings were based were so overborne by evidence calling for contrary inferences that the findings of the Board could not * * * be deemed to be supported by 'substantial' evidence." NLRB v. Pittsburgh S. S. Co., 340 U. S. 498, 502, 71 S.Ct. 453, 455, 95 L.Ed. 479 (1951).

Thus, critical to decision here are the inferences which the Board drew respecting Black Hawk's motive in the layoffs. Under 8(a)(3), "both discrimination and a resulting discouragement of union membership are necessary, but the added element of unlawful intent is also required." NLRB v. Brown, 380 U.S. 278, 286, 85 S.Ct. 980, 985, 13 L.Ed.2d 839 (1965).

■ The evidential features underpropping the Board's conclusion, make out a prima facie transgression of the Act. Black Hawk countered, however, with proof establishing that it was "motivated by legitimate objectives." NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 34, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967).

We think the Company sustained its plea, to repeat: that the change of practice—using direct shipments from the outlying warehouses to Stevens' manufacturing plants—was pursued because these warehouses by August, 1967, in

---

1. Stevens has been extensively involved in litigating unfair labor practice charges. Five orders of the Board have been enforced in whole or in part against it since 1967. J. P. Stevens & Co. v. NLRB, 380 F.2d 292 (2 Cir.), cert. denied 389 U.S. 1005, 88 S.Ct. 564, 19 L.Ed.2d 600 (1967); Textile Workers Union v. NL

RB, 388 F.2d 896 (2 Cir.1967), cert. denied sub nom. J. P. Stevens & Co. v. NLRB, 393 U.S. 836, 89 S.Ct. 112, 21 L.Ed.2d 107 (1968); J. P. Stevens & Co. v. NLRB, 406 F.2d 1017 (4 Cir. 1968); J. P. Stevens & Co. v. NLRB, 417 F.2d 533 (5 Cir. 1969).

the judgment of the company, had accumulated requisite quantities of cotton to render baling and grading operations feasible at the removed points; that incurrence of extra expense by shipping through Black Hawk was thereby obviated; and that the call for men at that warehouse declined.

The new shipping design certainly deserves an inference of fair dealing with labor as much as it does a sinister implication. Moreover, weight should be accorded the judgment of the Company, certainly ex facie presumed bona fide. Whether or not the rearrangement was warranted was a matter of the internal economy of the business, to be resolved by the Company. See J. A. Hackney & Sons, Inc. v. NLRB, 426 F.2d 943 (4 Cir. May 20, 1970). We do not think that inferences of unfairly motivated or invidious employee-discrimination are permissible because of the change in shipping practices.

Nor may such inferences be drawn in the instant situation from Stevens' history of union bias and knowledge of a current union campaign. These factors have been declared by this court in a corresponding situation to be "diminished to the point that [they] cannot be reasonably deemed to be 'substantial' in the *Universal Camera Corp.* sense." Maphis Chapman Corp. v. NLRB, 368 F.2d 298, 304 (4 Cir. 1966). There, the company was charged with an 8(a)(3) violation for releasing two employees, whom it knew were involved in the union campaign. The employer's general animosity towards unionization was beyond question. Nevertheless, the company was absolved of wrongdoing for one of the discharges, because the evidence overbalanced the possibility that the layoff was with a discriminatory purpose —the worker was a seasonal, rather than permanent employee. A similar conclusion must be reached instantly.

The Board's last ground for the finding of improper motive in the shipping changes was the hiring of the additional shop personnel. This, we think, is too

slight to provide any sign of ill will. Nothing in the record negates the Company's explanation for these hirings— that the amount of work in the shop necessitated the recruits.

In sum, the Board has failed to carry its obligation of proving that Black Hawk was prompted by a discriminatory purpose in discharging the 17 employees. Black Hawk's justifiable explanation for its conduct stands unrefuted, minifying the effect of the inferences the Board drew from its evidence on motive. The charge of an 8(a)(3) and its attendant 8(a)(1) violation cannot stand.

Enforcement granted in part and denied in part.

WINTER, Circuit Judge (dissenting):

After reciting the established rule that the Board's choice between two fairly conflicting views may not be displaced, Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and after concluding that the evidence prima facie supports the Board's conclusion that Black Hawk discriminatorily discharged 17 employees in violation of §§ 8(a)(3) and 8(a)(1), the majority, nevertheless, declines to enforce the Board's order in part. I read the majority's conclusion to rest in its appraisal that Black Hawk's evidence of non-discriminatory motive so overbore the Board's prima facie case that the latter is rendered without substantial support. I disagree.

Admittedly, there was a marked change in shipping pattern, with the result that the services of 17 warehouse employees at Black Hawk were allegedly no longer required. The question is what motivated the change. Was it knowledge of impending unionization of warehouse employees on the part of one of the most anti-union employers in current judicial decisions and an intention to stifle the union? Or was it, as Black Hawk contends and the majority accepts, the legitimate business reason that Ste-

vens had concentrations of cotton in warehouses other than Black Hawk sufficient to make possible grading in the other warehouses and shipment from them to points of manufacture, at greater economy, without resource to Black Hawk? For me, there is in this record ample evidence to support the finding that the former is what occurred.

The Board well summarized the basis for its conclusion that Black Hawk violated §§ 8(a)(3) and 8(a)(1) in the following portion of its opinion:

Respondent does not deny the unusual amount of cotton shipped directly from its outlying warehouses in the months surrounding the election, while activity at Black Hawk was low. We do not find its explanation for this change in method of operation a plausible one. Granted, the cotton had been consigned to those warehouses after Black Hawk had been filled quite high. However, it was not the placing of the cotton in those warehouses for storage that we find significant, it was rather that Respondent began shipping to its manufacturing plants directly from those warehouses, whereas in the past, when necessary to use outlying warehouses, the cotton was nevertheless shipped through Black Hawk and out to its plants. This practice was changed without plausible explanation at a time critical to the Union's campaign, in close proximity to the election, and as found by the Trial Examiner, at considerable cost to Respondent. Black Hawk had already passed its usual "low" season, and although as pointed out above the usual slack never came in 1967, Respondent had experienced some slack and had already lost or laid off some 11 employees before those here involved were let go.

Despite Respondent's attempts to justify its direct shipments through arguments of economy, the fact remains that it changed an established practice, whether it had been an un-economical one or not, thereby causing a layoff of 17 employees out of the approximately 50 on its payroll. We do not think a result different from the Trial Examiner's is called for because Respondent laid off its employees in strict keeping with length of service, and in the absence of a showing that any of those chosen were more active supporters of the Union than those retained. The layoffs were from the warehouse, where admittedly the Union's strength lay, at a time when Black Hawk would have remained busy if Respondent had continued its practice of prior years. We find that the layoffs were designed to dissipate the Union's strength, and were made because the employees had demonstrated their support of the Union.

A close reading of the foregoing discloses the key to the finding was the lack of plausible explanation for the change in practice. There was ample basis for a finding of lack of plausibility.

Initially, Black Hawk sought to explain the reduction in the warehouse force as one which would normally occur during the summer months, except that in 1967 they occurred later in the year. The record established, however, that reductions in work force in the past had occurred during the summer only because Stevens normally did not have cotton on hand for shipment during that season of the year. For 1967 Stevens' records showed that it had cotton available for shipment in the autumn of 1967 and was shipping cotton in record quantity into outlying independently owned warehouses in spite of the fact that the 1967 cotton harvest began late, and Stevens purchased less cotton than usual because of surplus purchasing in the preceding year.

Stevens then attempted to show that it had used one of the independent warehouses—Gulfport—to assure space and that it had committed itself to give cotton to Gulfport during the 1967–1968

season. That this explanation was specious was shown by records that only 5 carloads of cotton were shipped into Gulfport in the 1966–1967 season, and only 46 carloads in the six months before that, while 198 carloads of cotton were shipped to Gulfport in a mere two-month period in the early fall of 1967. Shipments on the latter scale would hardly have been made if Stevens' real reason for using Gulfport in the fall of 1967 had been to assure future availability of space there in accordance with past needs.

The explanation for the switch in the autumn of 1967 to the practice of shipping cotton directly from outlying warehouses to the consuming plants without passing through Black Hawk was no more satisfactory than the previous attempts to explain what had happened. Initially, Controller Woodside testified that there was no appreciable increase in direct shipments to the plants in the period beginning in August, 1967; but when general counsel proved otherwise, Woodside changed his testimony and admitted that in the first ten months of the 1967–1968 season Stevens nearly doubled the volume of its direct shipment, as compared with the entire preceding season. Woodside then sought to explain this increase on the ground that as a result of heavy purchases in the 1966–1967 season, Stevens had on hand an unusual amount of cotton stored in independent warehouses and thus was able to assemble and grade larger quantities of bales of cotton without shipping them through Black Hawk. In this connection, it is claimed that Stevens could save $1.40 per bale—the charge for unloading, handling and reloading cotton at Black Hawk—on all cotton shipped directly.

Even if the estimate of $1.40 per bale cost of handling at Black Hawk is accepted, the explanation overlooks the greater expense involved in storing cotton in independent warehouses for ex-

tended periods of time rather than at Black Hawk, a wholly-owned subsidiary, which was established and enlarged for this very purpose, and which had space, during the greater part of the period in question, to accommodate the cotton. Warehouse charges at an independent warehouse range from 40¢ to 50¢ per bale per month, and indirect expenses at Black Hawk continue whether it is used or not. Freight costs for shipping into Black Hawk and then to most of the manufacturing sites are no greater than direct shipment to plants from independent warehouses. The record shows that the majority of the cotton stored at independent warehouses was stored a sufficient period of time to incur storage charges of $1.40 per bale or greater at a time when space was available at Black Hawk. Black Hawk's argument that it was motivated by economics thus cannot withstand scrutiny. When the insubstantiality of this attempted explanation is coupled with the specious reasons previously advanced, I would conclude that the Board neither decided incorrectly nor that Black Hawk's evidence overbore the permissible inference drawn by the Board. I would enforce the order in its entirety.*

---

\* Since I differ from the majority in its main conclusion, I have no occasion to consider the subsidiary argument, advanced by the union, of whether the Board should have granted more stringent relief.